**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEYSTONE AUTOMOTIVE INDUSTRIES, INC. d/b/a ELITEK VEHICLE SERVICES, | ) ) ) | Case No. 1:23-cv-02689 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| REPAIRIFY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR VIOLATION OF ANTITRUST LAWS,
DECEPTIVE TRADE PRACTICES, UNFAIR COMPETITION, AND
TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

Plaintiff Keystone Automotive Industries, Inc. d/b/a Elitek Vehicle Services ("Elitek"), by and through its attorneys, files this Complaint for violation of antitrust laws, deceptive trade practices, unfair competition, and tortious interference with business relationships against Defendant Repairify, Inc. ("Repairify"), alleging as follows:

**NATURE OF THE ACTION**

1. This is an action for findings of antitrust violations under the antitrust laws of the United States, Title 15 United States Code § 1 *et seq.*, deceptive trade practice under Illinois law, common law unfair competition, and common law tortious interference with business relationships.

2. Elitek seeks this relief because Repairify, despite knowing that its patents were obtained from the United States Patent and Trademark Office by fraud, and knowing that its claim of patent infringement was objectively baseless, asserted those patents against Elitek causing it injury, in order to maintain its monopoly power in the remote vehicle diagnostic market.

**THE PARTIES**

3.      Elitek is a corporation organized under the laws of the State of California with a place of business at 500 W. Madison St., Suite 2800, Chicago, Il 60611.

4.      On information and belief, Repairify is a corporation organized under the laws of the State of Delaware, with a principal place of business located at 2600 Technology Drive, Suite 900, Plano, TX 75074.

**THE REMOTE VEHICLE DIAGNOSTICS MARKET**

5.      Modern vehicles have an on-board diagnostic system that allows a technician to use a scan tool connected to the vehicle to perform vehicle diagnostics, such as scanning or programming a vehicle's sub-systems.  Vehicle manufacturers provide scan tools that are specifically designed to work with their vehicles, but manufacturer scan tools are relatively expensive and require software that is routinely updated.  After market scan tools are less expensive than manufacturer scan tools, but typically have limited capabilities.  Instead of a repair shop purchasing scan tools and software, a repair shop can ask a third party, who already has the necessary scan tools, to provide vehicle diagnostic services.

6.      Typically, these third parties provide one or more of the following services:  a pre-scan, post-scan, and programming.  A pre-scan is used to determine which parts of a vehicle need to be repaired, e.g., identifying fault codes.  A post-scan is a quality control step used to ensure that the vehicle has been properly repaired, e.g., fault codes have been identified and cleared.  Programming typically involves updating software on a vehicle, e.g., the manufacturer has released a newer version of its software.  Third parties can provide these services remotely or directly by having a technician travel to the customer to perform the requested services (mobile).

2

7.     Elitek offers both remote and mobile vehicle diagnostic services to vehicle repair shops. Elitek's mobile diagnostic services consist of Elitek taking its scan tools to the repair shop to perform the necessary diagnostics. Elitek's remote diagnostic services consist of the repair shop contacting an Elitek call center to handle any requested services, including use of a scan tool, remotely.

8.     On information and belief, Repairify used to offer both mobile and remote diagnostics services, but it currently only offers remote diagnostics services.

9.     Elitek and Repairify compete in the Remote Vehicle Diagnostics Market, which is the market for providing vehicle diagnostics services to repair/collision shops in the United States from a remote location. The United States has laws and regulations that govern vehicles, such as emission controls, which are different than other countries. In addition, vehicle manufacturers typically sell different versions of their vehicles (or with different features or different software) in different countries. Furthermore, on information and belief, remote diagnostics have geographic limitations because of latency such that diagnostic servers located in one country such as the United States will likely be unable to provide services to a vehicle (customers) and/or using scan tools that are located outside of the country such as in European countries. For these reasons, customers in the United States look to purchase remote diagnostic products and services from companies in the United States.

10.     On information and belief, each of the companies that compete in the Remote Vehicle Diagnostics Market provide its customers a communication device that connects a vehicle to a remote scan tool over a network where the company uses the remote scan tool to scan (pre-scan and post-scan) and/or program the vehicle.

3

11.     On information and belief, alternative products and services such as mobile diagnostic services are not reasonable alternatives because they are not available in all geographic locations that can be serviced by remote diagnostic services, which only requires access to the Internet.  For example, Elitek's mobile services generally have a limited range of at most 80 miles from a city center (and typically a much smaller range like 30 miles).  In addition, Elitek only has approximately 85 locations in the United States, and it does not have locations in every state.  Furthermore, mobile services are not a reasonable alternative to remote services because of scheduling and time delays, e.g., a technician has to be available, the necessary scan tools have to be available, and the technician has travel to the customer, which can take significant time.  In addition, the customer has to be available to receive the technician and the vehicle has to be available/accessible when the technician arrives.

12.     Also, on information and belief, purchasing scan tools is not a reasonable option for customers because scan tools are relatively expensive, especially if a customer has to purchase one for each vehicle type it may service, and because the customers would need software licenses for each scan tool, which need continual renewals, which are also costly.

13.     On information and belief, except perhaps in extremely non-economically significant unrealistic hypotheticals, if the price for remote diagnostic services increases, it does not cause a rise in the demand for non-remote diagnostics services.

14.     On information and belief, there are less than six companies that compete in the Remote Vehicle Diagnostics Market such as Repairify, Elitek, Opus IVS, and AirPro Diagnostics LLC.  On information and belief, the Remote Vehicle Diagnostics Market has seen significant growth over the law few years and will continue to grow, due in part to the continued development of vehicles with complex electronic systems.  On information and belief, the Remote Vehicle

Diagnostics Market generates over $100 million a year in revenue and is expected to continue to grow significantly over the next several years, especially as older vehicles leave the marketplace.

## JURISDICTION AND VENUE

15.     This action arises under the antitrust laws of the United States, including, but not limited to, the Sherman Act and the Clayton Act, 15 U.S.C. § 1 *et seq.*

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under the antitrust laws of the United States.

17.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Elitek's state law and common law claims because they are so related to the federal claims that they form part of the same case or controversy.

18.     Personal jurisdiction and venue are proper for Elitek's antitrust claims in this judicial district pursuant to 15 U.S.C. § 22, which provides for nationwide service of process, and, hence, personal jurisdiction and venue anywhere Repairify transacts business, because Repairify transacts business in this judicial district.  Specifically, based upon a review of Repairify's publicly available marketing material, on information and belief:

- Repairify targets advertisements to existing and potential customers in this judicial district, including for its remote diagnostics products and services,

- Repairify has customers that it services and provides and/or sells products to in this judicial district, including its remote diagnostics products and services,

- Repairify provides services and products, including remote diagnostic services and products, to CDE Collision Centers, including to the at least eleven locations that CDE Collision Centers has in this judicial district, and has done so for at least the last five years,

- Repairify services and provides and/or sells products, including remote diagnostic services and products, to several national repair shops, such as DrivenBrands, including their locations in this judicial district,

- Repairify also has technicians in this judicial district that assist in providing services to its customers, including for its remote diagnostics products and services,

- Repairify has also partnered with Allstate Corp., a company with its principal location in this judicial district, in connection with its remote diagnostic products and services, and

- Repairify also has a subsidiary Repairify Keys, LLC, which is registered to do business in Illinois, and has done business in this judicial district related to its remote diagnostics products and services.

19.     Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 15 because, on information and belief, a substantial part of the events or substantial part of the property that is subject to this action is situated in this judicial district and because Repairify has an agent such as Repairify Keys, LLC doing business within this judicial district.

20.     Personal jurisdiction and venue for Elitek's state law and common laws claims are proper in this judicial district under the doctrines of pendent jurisdiction and venue because the state law and common law claims arise out of a common nucleus of operative facts with its antitrust claims.

## ACTS GIVING RISE TO THIS ACTION

21.     On December 23, 2010, the patentee filed U.S. Patent Application No. 12/977,830 ("the '830 application") in the U.S. Patent and Trademark Office ("PTO").  The PTO eventually issued the '830 application as U.S. Patent No. 8,688,313 ("the '313 Patent").  The application data sheet was signed by attorney Ury Fischer.

22.     On information and belief, on January 10, 2011, the inventors of the '313 patent executed an assignment assigning to Automotive Electronic Solutions, LLC (which changed its name to AES Technologies, LLC) "the full, exclusive and entire right, title, and interest in and to said application, in and to any divisions, continuations, and reissues thereof, and in and not all inventions and improvements disclosed and described in said application."

23.     On December 5, 2012, the PTO issued an Office Action rejecting the pending claims of the '830 application as being unpatentable over several prior art references, including U.S. Patent No. 6,728,603 ("Pruzan") and U.S. Patent Publication No. 2011/0313593 ("Cohen").

24.     On May 30, 2013, Fischer submitted a response to the rejection, which included amendments and arguments in an attempt to overcome the PTO's rejections.  In particular, Fischer made the following remarks:

> The present claims provide a system and method for continuous bi-directional communication between a localized vehicle sub-system and a remote diagnostic/programming tool (be it a scan tool or a computer emulating a scan tool). As the application states, once the described system is in place, the remote tool is able to program the sub-system as if it were located locally and directly connected to the sub system through the OBD port (see paragraph 0039). Using the described system, the remote tool and the sub-system are connected directly to each other and are unaware that they may actually be located miles away. The only way to achieve this type of functionality is to provide a continuous connection using a recognized OBD communications protocol between the diagnostic tool and the sub-system. The continuous connection, in essence, inserts the diagnostic tool as a node in the vehicle's diagnostic data bus. In the absence of such a continuous connection, the signal to and from the remote tool would fail to meet the latency and integrity requirements required to perform most of the tool's functions. If the latency and signal integrity requirements are not met this will cause the tool to withdraw from the vehicle network in order to protect both the vehicle and the tool.
>
> This requires that a continuous bi-directional communication exist across whatever medium is employed (Ethernet, WiFi, cellular, etc,) between the vehicle and the remote tool. The vast majority of scan tool activity consists of monitoring timing and latency dependent data on the targeted sub-system. In every-day use, there are relatively very few discrete commands flowing from a scan tool to the vehicle bus. No discrete commands ever flow from the vehicle bus to the scan tool. What is primarily exchanged between a vehicle and a scan tool is a stream of continuous

data. A communications link between the vehicle bus and the scan tool that is not continuous or bi-directional in nature would therefore severely limit the usefulness of any scan connected tool. Useful communication between a scan tool and a vehicle only takes place when the scan tool is "on the bus" with the other vehicle modules and is in continuous bidirectional, conversation with them, not through generation of a string of commands and sequential transmission thereof.

The system described in *Cohen*, in contrast is designed to act, essentially, as a "walkie-talkie" between the vehicle and the remote site. That is, although they communicate, they can only do so in one direction at a time and intermittently. In other words, the system described by *Cohen* is not continuously bi-directional. Because of this, the system of *Cohen* is only suitable to transmit discrete status information and to "toggle" settings remotely. The *Cohen* system is unsuitable to conduct the vast majority of operations that an automotive scan tool can perform which require the remote tool to be in continuous communication with the automotive diagnostic bus in order to monitor an ever-changing stream of data.

This is evidenced by the fact that the system described by *Cohen* does not utilize known standard OBD protocols which are specifically designed for continuous bi-directional communication. The *Cohen* vehicle module simply interrogates the vehicle and transmits information to the remote site in a proprietary, non-continuous protocol. The remote system then sends an instruction or command to the vehicle module, (again in a proprietary non-continuous protocol) which in turn transmits the instruction or command to the vehicle. For this reason, the *Cohen* system is only suitable for "toggling" of settings, not for monitoring of, and actions based on, data that is continuously flowing from the vehicle to a scan tool. In brief, a main distinguishing characteristic between *Cohen* and the claimed invention is that *Cohen* does not provide for, or establish, a continuous bi-directional communication using a standard OBD communications protocol between the vehicle and a remote tool. Applicants have previously amended the claims to clarify this limitation which patentably distinguishes the claimed invention from *Cohen*.

Similarly, neither *Pruzan, Ban* nor *Chinnadurai* describe a system where continuous bi-directional communication using a standard OBD communications protocol is established between the vehicle and a remote tool.

*Pruzan* describes a system for transmitting "messages" between a vehicle bus and a remote system. The remote system interprets the message and if it is understood and if there is a responding command that can be implemented, it generates the command and transmits it to the vehicle. *Pruzan* does not, and cannot, transmit a continuous stream of data to a remote location. Like *Cohen, Pruzan* does not communicate with the vehicle continuously and bi-directionally. It simply shuttles messages and commands back and forth between the vehicle and the remote system. This method of communication is only suitable for "toggling" of functions and other non-timing intensive applications. The system utilized by *Pruzan* would thus

8

be wholly unsuitable for the majority' of the functions the remote scan tool of the claimed invention is designed to perform.

25.     On July 30, 2013, the PTO issued an Office Action with a final rejection of the claims of the '830 application over several prior art references, including Cohen and Pruzan. On January 6, 2014, Fischer submitted a response to this final rejection with no further amendments to the claims, but instead repeating verbatim his remarks about Cohen, Pruzan, and the prior art:

The present claims provide a system and method for continuous bi-directional communication between a localized vehicle sub-system and a remote diagnostic/programming tool (be it a scan tool or a computer emulating a scan tool). As the application states, once the described system is in place, the remote tool is able to program the sub-system as if it were located locally and directly connected to the sub-system through the OBD port (see paragraph 0039). Using the described system, the remote tool and the sub-system are connected directly to each other and are unaware that they may actually be located miles away. The only way to achieve this type of functionality is to provide a continuous connection using a recognized OBD communications protocol between the diagnostic tool and the sub-system. The continuous connection, in essence, inserts the diagnostic tool as a node in the vehicle's diagnostic data bus. In the absence of such a continuous connection, the signal to and from the remote tool would fail to meet the latency and integrity requirements required to perform most of the tool's functions. If the latency and signal integrity requirements are not met this will cause the tool to withdraw from the vehicle network in order to protect both the vehicle and the tool.

This requires that a continuous bi-directional communication exist across whatever medium is employed (Ethernet, WiFi, cellular, etc,) between the vehicle and the remote tool. The vast majority of scan tool activity consists of monitoring timing and latency dependent data on the targeted sub-system. In every-day use, there are relatively very few discrete commands flowing from a scan, tool to the vehicle bus. No discrete commands ever flow from the vehicle bus to the scan tool. What is primarily exchanged between a vehicle and a scan tool is a stream of continuous data. A communications link between the vehicle bus and the scan tool that is not continuous or bi-directional in nature would therefore severely limit the usefulness of any scan connected tool. Useful communication between a scan tool and a vehicle only takes place when the scan tool is "on the bus" with the other vehicle modules and is in continuous bidirectional conversation with them, not through generation of a string of commands and sequential transmission thereof

The system described in *Cohen*, in contrast is designed to act, essentially, as a "walkie-talkie" between the vehicle and the remote site. That is, although they communicate, they can only do so in one direction at a time and intermittently. In other words, the system described by *Cohen* is not continuously bi-directional.

Because of this, the system of *Cohen* is only suitable to transmit discrete status information and to "toggle" settings remotely. The *Cohen* system is unsuitable to conduct the vast majority of operations that an automotive scan tool can perform which require the remote tool to be in continuous communication with the automotive diagnostic bus in order to monitor an ever-changing stream of data.

This is evidenced by the fact that the system described by *Cohen* does not utilize known standard OBD protocols which are specifically designed for continuous bi-directional communication. The *Cohen* vehicle module simply interrogates the vehicle and transmits information to the remote site in a proprietary, non-continuous protocol. The remote system then sends an instruction or command to the vehicle module, (again in a proprietary non-continuous protocol) which in turn transmits the instruction or command to the vehicle. For this reason, the *Cohen* system is only suitable for "toggling" of settings, not for monitoring of, and actions based on, data that is continuously flowing from the vehicle to a scan tool. In brief, a main distinguishing characteristic between *Cohen* and the claimed invention is that *Cohen* does not provide for, or establish, a continuous bi-directional communication using a standard OBD communications protocol between the vehicle and a remote tool. Applicants have previously amended the claims to clarify this limitation which patentably distinguishes the claimed invention from *Cohen*.

*Pruzan* describes a system for transmitting "messages" between a vehicle bus and a remote system. The remote system interprets the message and if it is understood and if there is a responding command that can be implemented, it generates the command and transmits it to the vehicle. *Pruzan* does not, and cannot, transmit a continuous stream of data to a remote location. Like *Cohen, Pruzan* does not communicate with the vehicle continuously and bi-directionally. It simply shuttles messages and commands back and forth between the vehicle and the remote system. This method of communication is only suitable for "toggling" of functions and other non-timing intensive applications. The system utilized by *Pruzan* would thus be wholly unsuitable for the majority of the functions the remote scan tool of the claimed invention is designed to perform.

26.     Relying on the aforementioned remarks, the PTO allowed the claims of the '830 application, which issued as the '313 patent.

27.     For several reasons, Fischer's remarks were knowingly misleading and material misrepresentations.

28.     On information and belief, based upon an objective analysis of the patent's specification and discussions with experts in remote communication devices, if it were to actually function, the inventor's embodiment of the invention would have to send data like Cohen, and

filter data and use acknowledgments to avoid vehicle errors as disclosed in Pruzan, and would not provide a continuous connection that inserted the remote tool as a node on the vehicle's bus as asserted. Furthermore, the following assertions by Fischer regarding the disclosed embodiment were false: that the system engaged in continuous bi-directional communication, that the system was able to program as if locally and directly connected, and that the system inserts the diagnostic tool as a node in the vehicle's diagnostic data bus. On information and belief, based upon standards and practices in the industry and Fischer's background and experience, Fischer was aware of how the inventor's embodiment of the invention would have had to function in order to be operable. Therefore, on information and belief, Fischer's remarks regarding how the claimed invention differed from the prior art were knowingly false representations.

29.     In addition, scan tool activity is dependent and will vary depending on the vehicles, scan tools, protocols, and functions involved, and the claims are not limited to any particular vehicle, scan tool, protocol, or function. For example, in some embodiments, the majority of scan tool activity will not consist of monitoring timing and latency dependent data on the targeted sub-system as Fischer claimed. Furthermore, in some embodiments, if not most, scan tool activity consists of discrete commands flowing from the scan tool to the vehicle bus. In addition, useful communications can and do take place without the scan tool being on the bus with the other vehicle modules. Also, a stream of continuous data is not what is primarily being exchanged between a vehicle and a scan tool at certain times or when certain protocols are being used. Thus, Fischer's remarks were not an accurate depiction of the state of the art, much less a requirement of the claims as suggested. Again, upon information and belief, based upon standards in the industry and Fischer's background and experience, Fischer was aware that these statements were not an accurate description of the state of the art.

11

30.     Moreover, Fischer's remarks about Pruzan were knowingly misleading and material misrepresentations.  Pruzan discloses the use of a local communication device that can listen to messages on the vehicle bus and exchange data wirelessly with a remote diagnostic system that includes a computer and a communication device that sends messages to and receive messages from a vehicle controller.  In Pruzan, the remote computer can monitor and/or insert messages onto the vehicle bus by using the communication devices.  Pruzan uses several SAE standard OBD protocols.  Also, while Pruzan teaches filtering of data, Pruzan also indicates that filtering of such data is optional such that its communication can be both bi-directional and continuous.  That is, contrary to Fischer's arguments, Pruzan discloses transmitting a continuous stream of data from a vehicle to a remote location.  In addition, Pruzan describes encapsulating OBD packet data from the vehicle bus to the remote system as described in the '313 patent, and the use of acknowledgements to avoid the vehicle's error detection, which on information and belief, is the same technique the inventors used to develop an embodiment of the 313 patent.  Lastly, in several places, also contrary to Fischer's arguments, Pruzan discloses a system that is capable of more than toggling functions and other non-timing intensive applications, but instead Pruzan is capable of both scanning and programming a vehicle remotely and is suitable for the majority of functions that scan tools are designed to perform.  Hence, Fischer's remarks about Pruzan in both the May 30, 2013 and January 6, 2014 responses were inaccurate because Pruzan disclosed most, if not all, of the elements claimed in the '313 patent.

31.     On information and belief, based upon a review of his publicly available marketing material, Fischer has a Bachelor of Science in Aerospace Engineering and Mathematics and worked as an engineer in industry before commencing his legal career, received his *Juris Doctor* in 1994, was admitted to the Florida bar in 1995, and has been a registered patent attorney since

1999.  As an attorney admitted to practice before the PTO, Fischer had a duty of candor and good faith to the PTO.  Fischer, who was an attorney of record on the '830 application and was substantively involved in its prosecution, affirmatively made the aforementioned statements, which are misleading and misrepresentative of the claimed inventions, the state of the art, and Pruzan, and both times that he made these false and misleading representations he knew them to be so.

32.    On information and belief, during the prosecution of the '313 patent, Fischer worked with client contact(s) and/or one or more of the named inventors ("AES Contacts").  On information and belief, the AES Contacts were aware of the aforementioned misleading statements made during prosecution of the '313 patent, and knew they were false and misleading or deliberately avoided learning the truth of the representations.  The AES Contacts were associated with the filing and prosecution of the '313 patent, and, therefore, each AES Contact (as well as Fischer) had a duty to disclose all information known to each of these individuals to be material to the patentability of the claims of the '313 patent to the PTO, not to practice or attempt to practice fraud on the PTO regarding the prosecution of the '313 patent, and not to act in bad faith or commit intentional misconduct regarding the prosecution of the '313 patent.  On information and belief, the AES Contacts and Fischer knew of the misleading and misrepresentative nature of these statements, knew of the poor financial condition of Fischer's client (discussed more fully below), and knew the perceived importance of obtaining patents to Fischer's client, and, hence, agreed to make and/or made the aforementioned statements with the specific intent to deceive the PTO.  But for these misleading and material misrepresentations by Fischer and the AES Contacts, the PTO would not have issued the claims of the '313 patent.

33.     On March 19, 2014, the patentee filed U.S. Application No. 14/219,183 ("the '183 application"), which was eventually abandoned, and U.S. Application No. 14,219,187 ("the '187 application), which eventually issued as U.S. Patent No. 9,684,500 ("the '500 patent"), both as divisions of the '313 patent.  The application data sheet for the '183 application and '500 patent were signed by Fischer.

34.     The '183 application shares the same specification as the '313 and '500 patents. The claims of the '183 application were substantially similar to the claims of the '313 and '500.

35.     On April 1, 2014, as discussed above, the PTO issued the '313 patent.

36.     On information and belief, in November 2014, AES Technologies, LLC filed for bankruptcy protection to pursue a sale of substantially all of its assets.

37.     On May 13, 2015, the PTO issued an Office Action rejecting the claims of the '183 application as being unpatentable over several prior art references including Hunt (U.S. Pat. No. 7,778,752), Asano (U.S. Appl. No. 2007/0100513), Naima (U.S. Appl. No. 2009/0150118), and Knight (U.S. Appl. No. 2003/0167345) ("the First '183 Rejection").

38.     The PTO examiner listed on the First '183 Rejection is Issac Smith, who was not identified as involved in the prosecution of the '313 or '500 patents.  The examiner for the '313 and '500 patents were Shardul Patel and Nga X. Nguyen, respectively.  Neither of whom were identified as being involved in the prosecution of the '183 application.

39.     Hunt discloses a system for connecting a telematics device to a vehicle using a wireless receiver configured to transmit diagnostic data.

40.     Asano discloses a system for remotely programming one or more vehicle sub-systems.   Specifically, Asano discloses a transceiver connected to the vehicle's data bus that has

bi-directional wireless communication with a remote transceiver connected to a remote server that allows the remote server to update the programs on the vehicle's sub-systems.

41.     Naima discloses a method and apparatus for secure wireless tracking and control. Specifically, Naima discloses a mobile computer connected to a vehicle's sub-systems that communicates bi-directionally and wirelessly over a network to a transceiver connected to a remote base computer.  The base computer can track, monitor, and/or control the vehicle by exchanging data with the mobile computer.

42.     Knight discloses a communications bridge between a vehicle information network and a remote system.  Specifically, Knight discloses communications between vehicle networks, which communicates using known standards, and a computer-based remote systems that converts and transmits data.

43.     In the First '183 Rejection, the PTO stated that Asano, Hunt, Naima, and Knight taught each of the claimed elements.  For example, the First '183 Rejection stated that Asano taught a system for remotely programming one or more sub-systems of a vehicle comprising a vehicle communication device and a remote communication device and to the extent Asano did not explicitly disclose other limitations, those limitations were "merely a collection of well-known components and steps which would have been obvious for a person having ordinary skill in the art at the time of the invention to include, as they were conventional and commonly used in vehicle diagnostics-related systems at the time of the invention, as seen in the prior art."   Furthermore, with respect to the limitations of a "vehicle communication device and said remote communication device enabled, to engage in continuous bi-directional communication using a standard OBD communications protocol, via a bi-directional communication link" and "wherein said remote communication device is enabled by said continuous bi-directional communication using a

15

standard OBD communications protocols to actively and continuously communicate with, scan and program said sub-systems as if it were located proximate to said vehicle," the First '183 Rejection stated that these "limitations were well-known and conventional in communication systems related to vehicle diagnostics, as seen in **Naima**."

44.    On information and belief, on June 3, 2015, Repairify executed an Asset Purchase Agreement with AES Technologies, LLC for a substantial portion of its assets out of bankruptcy that included a form patent assignment agreement for the '313 patent.  On information and belief, Repairify paid $4,750,000.00, plus additional consideration, for AES Technologies, LLC's assets.

45.    On information and belief, on July 28, 2015 AES Technologies, LLC, pursuant to the Asset Purchase Agreement, executed an assignment assigning to Repairify the '313 patent. This assignment did not include an assignment of any continuations or divisions to the '313 patent, such as the pending '500 patent, '183 application, or other patent applications related to the '313 patent.   On information and belief, this was the only patent assignment executed by AES Technologies, LLC to Repairify.

46.    On November 10, 2015, the patentee responded to the First '183 Rejection.  Fischer tried to overcome the First '183 Rejection by using arguments identical to arguments made during the prosecution of the '313 patent.  For example, Fischer stated as follows:

> The present claims provide a system and method for remotely programming one or more sub-system of a vehicle though a continuous bi-directional communication between a localized vehicle sub-system and a remote communication device. As the application states, once the described system is in place, the remote tool is able to program the sub-system as if it were located locally and directly connected to the sub system through the OBD port (see paragraph 0041 of the application). Using the described system, the remote tool and the sub-system are connected directly to each other and are unaware that they may actually be located miles away. The only way to achieve this type of functionality is to provide a continuous connection using a recognized OBD communications protocol between the diagnostic tool and the sub-system. The continuous connection, in essence, inserts the diagnostic tool as a node in the vehicle's diagnostic data bus. In the absence of such a continuous

16

connection, the signal to and from the remote tool would fail to meet the latency and integrity requirements required to perform most of the tool's functions. If the latency and signal integrity requirements are not met this will cause the tool to withdraw from the vehicle network in order to protect both the vehicle and the tool.

This requires that a continuous bi-directional communication exist across whatever medium is employed (Ethernet, WiFi, cellular, etc.) between the vehicle and the remote tool. The vast majority of scan tool activity consists of monitoring timing and latency dependent data on the targeted sub-system. In every-day use, there are relatively very few discrete commands flowing from a scan tool to the vehicle bus. No discrete commands ever flow from the vehicle bus to the scan tool. What is primarily exchanged between a vehicle and a scan tool is a stream of continuous data. A communications link between the vehicle bus and the scan tool that is not continuous or bi-directional in nature would therefore severely limit the usefulness of any scan connected tool. Useful communication between a scan tool and a vehicle only take place when the scan tool is "on the bus" with the other vehicle modules and is in continuous bidirectional conversation with them, not through generation of a string of commands and sequential transmission thereof.

The system described in Asano, in contrast is designed to act, essentially, as a "walkie-talkie" between the vehicle and the remote site. That is, although they communicate, they can only do so in one direction at a time and intermittently. In other words, the system described by Asano is not **continuously** bi-directional. Because of this, the system of Asano is only suitable to transmit discrete status information and to "toggle" settings remotely. For example, in paragraphs [0052] to [0087], Asano describes the communication between the base station and the vehicle-mounted transceiver unit. The steps never require or allow for the possibility of a **continuous** bi-directional communication between the devices. After the base station transmits a signal to the vehicle-mounted transceiver unit [0052], the base station then waits to receive a response [0062] prior to performing any future transmissions. Asano's base station simply interrogates the vehicle through its vehicle-mounted transceiver unit and then sends an instruction or command to the vehicle-mounted transceiver unit which in turn transmits the instruction or command to the vehicle. For this reason, Asano is only suitable for "toggling" of settings, not for monitoring of, and actions based on, data that is continuously flowing from the vehicle to a scan tool. The Asano system is unsuitable to conduct the vast majority of operations that an automotive scan tool can perform, which require the remote tool to be in continuous communication with the automotive diagnostic bus in order to monitor an ever-changing stream of data. In brief, a main distinguishing characteristic between Asano and the claimed invention is that Asana does not provide for, or establish, a continuous bi-directional. communication using a standard OBD communications protocol between the vehicle and a remote tool.

Hunt describes a system and transmitter to be connected to an existing OBD to provide date to a receiver. Hunt does not teach or suggest any data being sent to the

vehicle and is meant purely as a diagnostic tool. Similarly, Naima teaches a system for diagnostically checking information from the vehicle. Naima also does not teach or suggest a continuous bi-directional communication that would allow a user to update the vehicle's systems.

In the Office Action, the Examiner states that it would have been obvious to use Asano in view of Hunt and further in view of Naima to achieve a system where remote continuous bi-directional transmission of vehicle data is enabled. However, none of the cited prior art teaches or suggests a **continuous** bi-directional communication as claimed in the present invention. For at least this reason, the claim 1 is not obvious in view of the cited prior art and is allowable. As claims 2-9 all depend on claim 1, they are likewise allowable.

47.    Also, on November 10, 2015, Fischer filed a terminal disclaimer in the '183 application over the '500 patent, which is a legal disclaimer of the enforceable term of any patent issuing from the '183 application that would ordinarily extend past the term of the '500 patent on the grounds that the '183 application and '500 patent claim essentially the same invention.

48.    After the First '183 Rejection, Fischer also continued to be involved in the prosecution of the '500 patent. For example, on November 10, 2015, Fischer filed a response in the prosecution of the '500 patent that included a terminal disclaimer over the '183 application, this time disclaiming any enforceable term of the '500 patent that would ordinarily extend past the term of any patent issuing from the '183 application again on the grounds that they claim essentially the same invention.

49.    On March 3, 2016, the PTO issued an Office Action in the prosecution of the '183 application, which was sent to Fischer's firm, finding Fischer's arguments unpersuasive, and maintained the rejection of the claims of the '183 application as being unpatentable over several prior art references, including Hunt, Asano, Naima, and Knight ("the Second '183 Rejection").

50.    The Second '183 Rejection notes that the "Applicant's specification makes no mention of the word 'continuous', and the Applicant's arguments fail to describe how the word 'continuous' implies a step somehow not taught by the prior art. . . . The Applicant fails to

18

specifically what timing of data transmission is implied by the claimed 'continuous' communication and is not rendered obvious by the prior art. As mentioned before, **the word 'continuous' does not even appear in the Applicant's specification.'**" As noted above, this was one of the key, but knowingly false, arguments made by Fischer in order to wrongfully obtain allowance of the '313 patent.

51. In addition to repeating its positions from the First '183 Rejection, the Second '183 Rejection further added about the prior art, in part, that:

- "the system of *Asano* is clearly suited for any bi-directional communication;"

- "it is clear that this detection and transmission of diagnostic information of Naima is **continuously** performed;" and

- "the claimed '**continuous bi-directional communication**' . . . is rendered obvious by the prior art."

52. At the time of the Second '183 Rejection, the patentee, including Fischer, was aware that its statement about the invention, state of the art, and the prior art made during the prosecution of the '313 patent were not considered accurate by at least some of the examiners at the PTO as evidence by the Second '183 Rejection.

53. On information and belief, Fischer was aware of Hunt, Asano, Naima, Knight, the First '183 Rejection, and the Second '183 Rejection but did not submit them to the PTO during the prosecution of the '500 patent with an intent to deceive.

54. On or about March 14, 2016, Repairify requested that Fischer transfer all patent prosecution files, including files related to the '183 application, the '500 patent prosecution, and foreign counterparts to Robert King and his firm, Hunton & Williams LLP.

55. On April 20, 2016, Robert King filed a Request for Continuing Examination ("RCE"), which is effectively a payment to allow continue prosecution of a patent application after

final rejection, and response in the '500 patent application. The April 20, 2016 response cancelled all of the pending claims and added new claims.

56.     On April 25, 2016, Robert King filed powers of attorney in the '183 application and the '313 and '500 patents.

57.     On May 5, 2016, King filed a supplemental response to its April 20, 2016 response to the PTO in the prosecution of the '500 patent to add two more claims. On July 14, 2016, King participated in an interview with the PTO regarding the '500 patent.

58.     On August 2, 2016, Repairify filed a complaint against AirPro Diagnostics, LLC ("AirPro"), a competitor in the Remote Vehicle Diagnostics Market, in the United States District Court for the Middle District of Florida, Case No. 3:16-cv-00984 making allegations of false advertising, deceptive and unfair trade practices, breach of contract, and tortious interference. On information and belief, a substantial portion of Repairify's claims were directed at two of the inventors of the '313 patent who, at the time, were working for AirPro.

59.     On September 13, 2016, AirPro answered the complaint and asserted counterclaims of false advertising and deceptive trade practices against Repairify. AirPro alleged that the services and products that Repairify sold that allegedly practice the '313 patent ("the asTech") did not provide the same functionality as a scan tool directly connected to a vehicle. AirPro alleged that Repairify's allegation that the asTech (the device that Repairify sold that allegedly embodied the '313 Patent) can provide true OEM scan tool functionality was false and identified specific functions that the asTech could not provide, but a directly connected OEM scan tool could provide. On information and belief, AirPro sold products and services that competed with Repairify's asTech device and related services. On information and belief, the AirPro device did not practice the claims of the '313 patent.

60.     On September 22, 2016, King filed a response to the PTO during the prosecution of the '500 patent.

61.     The patentee did not substantively respond to the Second '183 Rejection. Therefore, on October 6, 2016, the PTO issued a notice of abandonment for the '183 application. Thus, during the '183 application, the PTO rejected nearly identical claims to the '500 patent based on Hunt, Asano, Naima, and Knight.

62.     On December 9, 2016, King filed another response to the PTO during the prosecution of the '500 patent. On February 23, 2017, the PTO issued a Notice of Allowance for the '500 patent. On March 28, 2017, King filed an information disclosure statement with the PTO for the '500 patent. King did not disclose at any time during the prosecution of the '500 patent the First '183 Rejection, the Second '183 Rejection, Hunt, Asano, Naima, Knight, or that the '183 application had been abandoned. There is no record of the examiners of the '500 patents considering or being provided with the First '183 Rejection, the Second '183 Rejection, Hunt, Asano, Naima, Knight, or other relevant material from the '183 application such as its notice of abandonment. That is, during the prosecution of the '500 patent, these materials were not disclosed to the PTO.

63.     On information and belief, on June 9, 2017, Repairify and AirPro settled its litigation with neither party paying the other anything, but the parties providing releases and agreeing to dismiss their claims against each other.

64.     On June 12, 2017, the patentee filed U.S. Application No. 15,619,743 ("the '743 application), which eventually issued as U.S. Patent No. 10,528,334 ("the '334 patent"). The '334 patent is a continuation of the '500 patent. The application data sheet for the '334 patent was signed by Robert King. At this time, King also submitted an information disclosure sheet.

65.     On June 20, 2017, the PTO issued the '500 patent.

66.     The specification of the '334 patent is identical to the specification of the '500 patent, the '313 patent and the abandoned '183 application. The examiner involved in the review of the '334 patent (Nga X. Nguyen) was not the examiner for the abandoned '183 application. On January 7, 2020, the PTO issued the '334 patent.

67.     Like the '500 patent, at no time during the prosecution of the '334 patent did King disclose to the examiners of the '334 patent the First '183 Rejection, the Second '183 Rejection, Hunt, Asano, Naima, Knight, or that the '183 application had been abandoned. And also like the '500 Patent, there is no record of the examiners of the '334 patent considering or being provided with the First '183 Rejection, the Second '183 Rejection, Hunt, Asano, Naima, Knight, or other relevant material from the '183 application such as its notice of abandonment. That is, during the prosecution of the '500 and '334 patents, these materials were not disclosed to the PTO.

68.     As evidenced by the PTO rejecting the claims of the '183 application based upon a double patenting rejection, and Fischer overcoming that objection by filing a terminal disclaimer, and the PTO rejecting the claims of the '334 patent based upon a double patenting rejection in light of the '500 patent and King overcoming that objection by filing a terminal disclaimer, the claims of the '183 application are substantially similar to the claims of the '500 and '334 patents and claim the same alleged invention. For example, the claims of all three patents recite a first communication device connected and proximate to a vehicle in communication with a second communication device located remote from the vehicle and connected to a scan tool that can scan and program the vehicle as if the scan tool were located proximate to the vehicle.

69.     In the Notice of Allowability for both the '500 and '334 patents, the examiner indicated that the closest prior art did not teach or make obvious the last limitation of enabling the

vehicle scan tool to scan and program a vehicle sub-system of the subject vehicle as if it the vehicle scan tool were located proximate to the subject vehicle. This statement is contrary to what the PTO determined during the prosecution of the '183 application. If the PTO examiners of the '500 and '334 patents were aware of Hunt, Asano, Naima, and Knight, as well as the First and Second '183 Rejections and related materials, the PTO would not have allowed the claims of the '500 and '334 patents to be issued.

70.     On information and belief, King has a Bachelor of Science in Electrical Engineering, received his *Juris Doctor* in 1999, and has been a registered patent attorney since 1999. As an attorney admitted to practice before the PTO, King has a duty of candor and good faith to the PTO.

71.     On information and belief, Fischer and/or King was involved in the decision to not respond to the Second '183 Rejection, which was a final rejection, and let the '183 application become abandoned. That decision is in contrast to how the patentee prosecuted the '313 and '500 patents. For example, during the prosecution of the '313 patent, Fischer responded to a final rejection and filed a RCE before the PTO allowed the claims. Likewise, during the prosecution of the '500 patent, King responded to a final rejection by filing a Pre-Brief Conference request with arguments in order to overcome the final rejection.

72.     Furthermore, on April 20, 2016, less than two months after the Second '183 Rejection, King filed a RCE in the '500 patent prosecution cancelling the pending claims, which were similar to the pending claims of the '183 application that focused on the communication devices each having a socket and enabled by continuous bi-directional communication, and added new claims that eventually issued as the '500 patent that did not recite certain elements found in

the '183 application claims such as communication devices with sockets that were enabled by continuous bi-directional communication.

73.    Moreover, on information and belief, King's typical prosecution practice includes:

1)  when filing a power of attorney during prosecution of an application, determining whether there is any pending deadlines or other response due, including review of the most recent prosecution event;

2)  after filing a power of attorney, making sure the power of attorney is properly acknowledged (as he did for the '313 and '500 patents); and

3)  prior to issuance of a patent application, reviewing related applications and foreign counterpart applications to identify any prior art that needs to be disclosed.

On information and belief, King either intentionally did not follow his typical prosecution practice with respect to determining whether there was a response due in the '183 application when he filed his Notice of Appearance in order to be willfully blind to Hunt, Asano, Naima, Knight, the First '183 Rejection, and the Second '183 Rejection or followed those prosecution practices and was aware Hunt, Asano, Naima, Knight, the First '183 Rejection, and the Second '183 Rejection but did not submit them to the PTO during the prosecution of the '500 and '334 patents with an intent to deceive.

74.    Furthermore, on information and belief, King, prior to issuance of the '500 patent either intentionally did not review the related '183 application to determine if there was prior art or other material information from that application to be cited to the examiners of the '500 and '334 patents or did review the related '183 application and was aware Hunt, Asano, Naima, Knight, the First '183 Rejection, and the Second '183 Rejection but did not submit them to the PTO during the prosecution of the '500 and '334 patents with an intent to deceive.  On information and belief,

24

King believed that applications related to the '500 and '334 patents such as the '183 application likely had material information related to the '500 and '334 patents and took deliberate actions to avoid learning of any such material information.

75.     Fischer and King were both attorneys of record during the '183 application and both were involved in the prosecution of the '183 application and '500 patent.  King was also involved in the prosecution of the '334 patent.  On information and belief, during the prosecution of the '183 application and the '500 patent, Fischer worked with the AES Contacts and client contact(s) at Repairify including at least Douglas Kelly, Wade Varner, and Lisa De Long ("Repairify Contacts").  On information and belief, during the prosecution of the '183 application, '500 patent, and '334 patent, King worked with the Repairify Contacts.

76.     On information and belief, Fischer and the AES Contacts had knowledge of Hunt, Asano, Naima, Knight, and the First and Second '183 Rejections, knew of the financial condition of Fischer's client, and knew the perceived importance of obtaining patents to Fischer's client.  On information and belief, King and the Repairify Contacts had knowledge of and/or was willfully blind to Hunt, Asano, Naima, Knight, the First '183 Rejection, and the Second '183 Rejection.

77.     On information and belief, the AES Contacts and/or the Repairify Contacts were associated with the filing and prosecution of the '500 patent and '334 patent, and, therefore, each AES Contact and each Repairify Contact (as well as Fischer and King) had a duty to disclose all information known to each of these individuals to be material to the patentability of the claims of the '500 and '334 patents to the PTO, not to practice or attempt to practice fraud on the PTO regarding the prosecution of the '500 and '334 patents, and not to act in bad faith or commit intentional misconduct regarding the prosecution of the '500 and '334 patents.

78.     On information and belief, Fischer and the AES Contacts failed to disclose Hunt, Asano, Naima, Knight, the First '183 Rejection, Second '183 Rejection, and other relevant materials related to the prosecution of the '183 application to the examiners of the '500 patent during its prosecution with specific intent to deceive the PTO.  On information and belief, King and the Repairify Contacts failed to disclose Hunt, Asano, Naima, Knight, the First '183 Rejection, Second '183 Rejection, and other relevant materials related to the prosecution of the '183 application to the examiners of the '500 and '334 patents during their prosecution with specific intent to deceive the PTO.

79.     But for these material omissions by Fischer, King, the AES Contacts, and the Repairify Contacts, the PTO would not have issued the claims of the '500 and '334 patents as those claims have practically the same scope as the claims of the rejected and abandoned claims of the '183 application.

80.     On information and belief, on April 15, 2019, Repairify filed a second complaint against AirPro Diagnostics, LLC in the United States District Court for the Southern District of Texas, Case No. 19-cv-1370 alleging false advertising, business disparagement, intentional interference with business relationships, and defamation.  On information and belief, in its second complaint against AirPro, Repairify alleged that:

- the first version of the asTech device developed by AES Technologies, LLC had "known issues and short-comings;"

- as part of its due diligence in purchasing AES Technologies, LLC assets out of bankruptcy, Repairify "confirmed major deficiencies" with the first generation asTech, including a "significant lack of coverage, missing communication on the vehicle's on-board diagnostic system ('OBD II') port, inability to communicate

with the medium speed BUS and most importantly the inability to deal effectively with internet latency issues;"

- Repairify "spent the next 12 months and invested millions of dollars in research and development to address these deficiencies and create a better product;"

- Repairify "did extensive regression testing and field work on a next generation device, including by leveraging its relationship with Copart, Inc. . . . to access hundreds of wrecked vehicles, in order to test that the [second generation asTech] worked as promised;"

- Repairify "completely recreated its [asTech] product;" and

- that "the current asTech Device is not an enhanced version of the First Gen asTech device, but rather a completely new product, build from the ground up."

81. On information and belief, on August 22, 2019, the European Patent Office ("EPO") rejected EP Application No. 11851089, which is the European counterpart to the '313 patent, having the same specification, substantially similar claims, and claimed priority to the same application. The EPO rejected the claims of the European counterpart to the '313 patent based on the publication "Teleservice of CAN Systems via Internet" by Gruhler et. al published in 1999 ("Gruhler"). On information and belief, Repairify has tried several times to overcome the rejection based on Gruhler in the European counterpart, but the EPO has continually rejected the claims of the European counterpart based on Gruhler, has refused to issue it as a patent, and has terminated the prosecution due to Repairify's failure to respond to the last rejection. Gruhler anticipates or renders obvious all of the claims the '334, '500 and '313 patents as shown in the claim chart attached as Exhibit A, incorporated herein by reference.

82. In early 2021, Elitek began offering remote vehicle diagnostics services in the United States.

83. On August 9, 2021, Repairify filed a complaint for patent infringement against Elitek asserting the '313, '500, and '334 patents in the United States District Court for the Western District of Texas, Case No. 6:21-cv-00819.

84. On information and belief, Repairify was aware (and a reasonable litigant would have been aware) before it filed its complaint against Elitek that the assignment assigning the '313 patent to Repairify did not include the '500 and '334 patents and that there were no assignments that conveyed ownership of the '500 and '334 patents to Repairify. Therefore, at the time Repairify filed its complaint against Elitek, it did not own the '500 and '334 patents, did not have standing to assert those two patents in a patent infringement action, and, on information and belief, knew or was willfully blind of this.

85. On information and belief, Repairify was required to perform a pre-filing investigation of its claims, which must include a review of the prosecution histories of the '313, '500, and '334 patents as well as the '183 application. Hence, on information and belief, before filing its complaint, Repairify was aware (and a reasonable litigant would have been aware) of the material misrepresentations made during the prosecution of the '313 patent, that the PTO had rejected the same arguments during the prosecution of the '183 application, that material references (Asano, Hunt, Naima, Knight, First '183 Rejection, and Second '183 Rejection) from the '183 application were known to the patentee, but yet not cited during the prosecution of the '500 and '334 patents.

86.     Moreover, on information and belief, Repairify, at the time it filed its complaint, knew or was willfully blind (and a reasonable litigant would have been aware), that these misrepresentations and omissions were made with the intent to deceive the PTO.

87.     Further, on information and belief, Repairify, at the time it filed its complaint, was aware (and a reasonable litigant would have been aware) that but for these misrepresentations and omissions, the PTO would not have issued the '313, '500, and '334 patents, *i.e.,* that the '313, '500, and '334 patents were fraudulently obtained.

88.     On information and belief, as part of its prefiling investigation, Repairify became aware or should have become aware (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents were invalid under 35 U.S.C. § 101 for being directed to an abstract idea.  Specifically, the '313, '500, and '334 patents are directed toward the unpatentable abstract idea of remotely scanning and programming a vehicle.  The '313, '500, and '334 patents disclose that it is well-known to scan and/or program the vehicle by connecting a scan tool to a vehicle. The '313, '500, and '334 patents explain that scan tools are expensive, are often specific to a particular brand of vehicle requiring a shop to acquire many different ones and are constantly being updated.  The '313, '550, and '334 patents allege to be an advance over the prior art by having the scan tool located remotely and scanning and programming the vehicle over a network.  Therefore, instead of each repair shop buying a multitude of scan tools, a single call center can purchase them and then communicate with and program many vehicles remotely over a network.  The '313, '500, and '334 patents do not identify or describe any other difference or advantage over the prior art. Hence, on information and belief, Repairify knew or should have known (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents are directed at an abstract idea.

29

89.     Furthermore, the claims of the '313, '500, and '334 patents recite the use of generic components performing routine functions. The '313, '500, and '334 patents do not describe any new or improved connector, interface, tool, connection, protocol, network, or implementation thereof or describe any new or improved method of receiving, converting, or sending data. On information and belief, Repairify knew or should have known (and a reasonable litigant would have been aware) that the use of conventional components performing routine tasks recited in the claims is not an inventive concept and does not transform the abstract idea claimed into patentable eligible subject matter.

90.     On information and belief, as part of its prefiling investigation, Repairify became aware or should have become aware (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents were invalid under 35 U.S.C. §§ 102 or 103 based on the Asano, Hunt, Naima, and Knight references that were disclosed during the prosecution of the '183 application, as discussed above.

91.     On information and belief, as part of its prefiling investigation, Repairify became aware or should have become aware (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents were invalid under 35 U.S.C. §§ 102 or 103 based on Gruhler. Gruhler was not considered by the PTO during the prosecution of the '313 and '500 patents and was only submitted during the prosecution of the '334 patent after the PTO allowed the claims.

92.     On information and belief, as part of its prefiling investigation, Repairify became aware or should have become aware (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents were invalid under 35 U.S.C. § 112 for not being enabled because the specification fails to teach one of ordinary skill in the art how to make and use the full scope of the claimed invention without undue experimentation. On information and belief, Repairify was

aware or should have become aware (and a reasonable litigant would have been aware) that the inventors the '313, '500, and '334 patents, after the '313 patent was filed, were unable to build an embodiment of their invention without undue experimentation, which was evidenced, for example, by the allegations made both by and against Repairify in the two separate litigations it filed against AirPro. On information and belief, Repairify knew or should have known (and a reasonable litigant would have been aware) when filing its complaint against Elitek that the inventors (and later Repairify itself) had to engage the assistance of multiple outside specialty companies, spent years and millions of dollars, and countless hours trying to develop an embodiment of these patents and that such effort was undue.

93.     On information and belief, as part of its prefiling investigation, Repairify became aware or should have become aware (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents were not infringed by Elitek. Repairify's allegations of infringement are based on features found in cited prior art such as Cohen and Pruzan that Repairify distinguished during prosecution. Further, as Repairify knew or should have known (and a reasonable litigant would have been aware) all the claims of the '313, '500, and '334 patents require, among other limitations not met by Elitek's system, that the device operate as if it is directly connected to the vehicle, and Elitek's device does not meet this limitation literally or under the doctrine of equivalence (which is not available for that limitation in any event because Repairify relied upon that limitations (as shown above) to distinguish over the cited art). Thus, Repairify's allegations that Elitek's product merely practices the prior art are not sufficient to establish infringement.

94.     Therefore, on information and belief, Repairify knew at the time of its complaint (and a reasonable litigant would have been aware) that the '313, '500, and '334 patents were fraudulently obtained, not wholly owned by Repairify, invalid for inequitable conduct, invalid

based on prior art, invalid for lack of enablement, and not infringed by Elitek but proceeded to file its complaint against Elitek to cause harm to Elitek, in order to reduce, hinder or suppress competition in the Remote Vehicle Diagnostic Market and to help Repairify maintain its monopoly power in the Remote Vehicle Diagnostic Market. The filing of the complaint, as well as direct comments made to customers alleging infringement by Elitek when Repairify knew those claims had no merit, also constituted deceptive trade practice, unfair competition with Elitek, and tortious interference with Elitek's business (prospective and current) relationships.

95. On November 9, 2021, Elitek sent Repairify a letter pursuant to Federal Rule of Civil Procedure 11 with an attached motion for sanctions identifying at least five reasons that Repairify's complaint against Elitek was frivolous. The reasons identified in the letter and motion included that the '313, '500, and '334 patents were 1) not infringed because during prosecution the patentee distinguished its invention from the prior art systems that transmit information in the same manner used by Elitek; 2) invalid under 35 U.S.C. § 101 for being directed toward an abstract idea; 3) invalid under 35 U.S.C. §§ 102, 103 based on prior art cited during the prosecution of the '183 application; 4) invalid under 35 U.S.C. §§ 102, 103 based on prior art cited during the European counterpart; and 5) unenforceable due to inequitable conduct. Hence, as of at least Repairify's receipt of this letter, Repairify was aware of these issues and the frivolous nature of its lawsuit against Elitek.

96. On December 7, 2022, Elitek deposed Charles Olsen, one of the named inventors of the '313, '500, and '334 patents, which was also attended by counsel for Repairify. Olsen testified that the inventors did not begin to work on a product that practiced the claims of the invention until after they filed the '313 patent application, that it took them many months to develop a device that could just read a VIN number with no other functionality, and that it took

32

them years to get a device that could occasionally read and write to the vehicle. Hence, as of at least the Olsen deposition, Repairify was aware of that the '313, '500, and '334 patents were invalid for lack enablement.

97. As a result of the complaint filed by Repairify, and allegations directed at customers that use of Elitek's service would constitute patent infringement, Elitek has lost existing customers in the Remote Vehicle Diagnostics Market. For example, at least one customer stopped using Elitek's remote vehicle diagnostic services citing concerns about Repairify's patent infringement complaint. On information and belief, Repairify informed the customer of the existing litigation and that customer switched to use Repairify's products and services because of the existing litigation. Since the filing of Repairify's patent infringement complaint, Elitek has lost other customers, and, on information and belief, those customers stopped using Elitek's products and services because of Repairify's patent infringement complaint.

98. As a result of the complaint filed by Repairify and allegations that use of Elitek's product would infringe Repairify's patents, Elitek has lost potential customers in the Remote Vehicle Diagnostics Market. For example, Elitek submitted a bid to provide remote vehicle diagnostic services to a national brand, but the national brand did not select Elitek citing that it had concerns about Repairify's patent infringement complaint. On information and belief, Repairify informed the potential customer of the existing litigation, and that customer chose to use Repairify's products and services because of the existing litigation. On information and belief, Repairify has and continues to inform customers (including existing and potential Elitek customers) about the existing litigation in order to gain new customers, maintain its customers, and dissuade customers from using Elitek's products and services.

99. Repairify's actions are anti-competitive, deceptive, and unfair, have caused Elitek injury, and will continue to injure Elitek. Therefore, Repairify's actions are in violation of the antitrust laws of the United States, Illinois' Uniform Deceptive Trade Practices Act, and Illinois common law unfair competition and tortious interference with business relationships.

## COUNT I

### (Monopolization and Attempted Monopolization – Walker Process)

100. Elitek hereby re-alleges and incorporates by reference, as if fully set forth herein, the allegations of Paragraphs 1 through 99.

101. Repairify has monopolized or engaged in activities with the specific intent to monopolize the Remote Vehicle Diagnostics product market (as defined above as providing vehicle diagnostics services to repair/collision shops from a remote location) in the geographic market defined as the United States (as determined through considerations of applicable regulations, vehicle availability, technical limitations, and where customers would look to source Remote Vehicle Diagnostics products), collectively the Remote Vehicle Diagnostics Market.

102. Repairify has attempted to maintain its monopoly by knowingly asserting fraudulently obtained patents with the intent of hindering competition in the Remote Vehicle Diagnostics Market, and not just injure the recipients of those claims, but competition in the Remote Vehicle Diagnostics Market itself by discouraging competitors such that they were unable to offer competing solutions at competitive prices, or engaged in that activity with an intent to achieve monopoly power and, taken as a whole, have created a dangerous probability of achieving monopoly power.

103. On information and belief, despite knowing that the '313, '500, and '334 patents were procured by fraud, Repairify filed a complaint for patent infringement against Elitek asserting the '313, '500, and '334 patents for anticompetitive purposes. Specifically, on information and

belief, Repairify is trying to willfully maintain its monopoly power in the Remote Vehicle Diagnostics Market by asserting these patents against Elitek that it obtained by knowing and willful fraud and that it has enforced them with knowledge of the fraudulent procurement..

104.    On information and belief, Repairify was aware that the '313 patent was procured by fraud.  On information and belief, Repairify was aware that, during the prosecution of the '313 patent, the patentee made material misrepresentations with the intent to deceive the PTO and that the PTO relied on those misrepresentations and issued the '313 patent.  As described above, during the '313 patent prosecution, the patentee made material misrepresentations regarding the state of the art, the pending patent claims, and the prior art cited by the PTO such as Pruzan.

105.    On information and belief, Repairify was also aware the '500 and '334 patents were procured by fraud.  On information and belief, Repairify was aware that, during the prosecution of the '500 and '334 patents, the patentee was aware of material references but did not submit those references to the PTO with an intent to deceive the PTO, and if those references had been submitted, the PTO would not have issued the '500 and '334 patents.  As described above, the PTO twice rejected similar claims to the '500 and '334 patents during the prosecution of the '183 application using prior art (Asano, Naima, Hunt, and Knight) and rejected the patentee's argument trying to overcome these rejections.  Despite these rejections, the patentee did not submit these references (Asano, Naima, Hunt, or Knight) or the '183 application rejections to the examiner of the '500 and '334 patents, who was not involved in the prosecution of the '183 application.

106.    On information and belief, as discussed above, Repairify is enforcing the '313, '500, and '334 patents against Elitek despite knowing that the patentees abused the patent system by obtaining these patents by committing willful fraud on the patent office, which constituted

inequitable conduct, in order to use the litigation process itself to hinder and suppress competition such that it can maintain its monopoly position and supra competitive profits.

107.    On information and belief, Repairify possesses and currently exercises monopoly power in the Remote Vehicle Diagnostics Market as demonstrated by its high market share of the Remote Vehicle Diagnostics Market, high barriers to entry (as described below), ability to control prices for remote vehicle diagnostic services, existing business relationships, relative size to the other competitors, and ability to exclude competition.

108.    On information and belief, Repairify is owned by Kinderhook Industries LLC, a private investment firm that manages over $5.4 billion in committed capital.[1]  On information and belief, Repairify received a strategic investment from 3M, a Fortune 500 company with $35.4 billion in total sales in 2021, that also found to have used frivolous claims of patent infringement in an effort to monopolize a market, to help "further expand and accelerate its proprietary tools, technology, and service offerings."[2]  On information and belief, based on Repairify's press release, Repairify completed more than 12.4 million automotive diagnostic scans and delivered over 4.9 million diagnostic reports in 2021."[3]  On information and belief, based on Repairify's website, Repairify has over 400 technicians, over 1000 OEM scan tools, and has scanned over 5 million vehicles.[4]  On information and belief based on publicly available sources, Repairify's revenue is estimated to be over $100 million per year.

---

[1] January 11, 2022 Repairify press release entitled "asTech's Patented Rules Engine Noe Available to Help Repairers Affirm OEM & OEM-Compatible Scans for Insurance Carrier Reimbursement." *See* https://astech.com/astechs-patented-rules-engine-is-now-available/.
[2] https://www.kinderhook.com/press-release/astech-receives-strategic-investment-from-3m/; https://fortune.com/company/3m/fortune500/
[3] March 24, 2022 Repairify press release entitled "Repairify completed 12.4M diagnostics scans in record 2021." https://astech.com/repairify-completed-12-4m-diagnostic-scans-in-record-2021/.
[4] https://astech.com/about/

109.    On information and belief based on publicly available information, Repairify promotes itself as the "market leader in the automotive repair industry through sales of its innovative and reliable remote scanning devices."[5]  On information and belief, Repairify has over 50% of the Remote Vehicle Diagnostics Market, giving it the largest market share of the companies competing in the Remote Vehicle Diagnostics Market.  On information and belief, Repairify's market share is over 20 times larger than Elitek's market share in the Remote Vehicle Diagnostics Market.  On information and belief, Repairify has the ability to undercut its competitors' pricing.

110.    On information and belief, there are significant barriers to entry into the Remote Vehicle Diagnostics Market.  On information and belief, it takes a significant investment in time and money to develop the infrastructure, software, and tools needed for remote vehicle diagnostics. For example, on information and belief, AES Technologies, LLC (the predecessor to Repairify) spent about four years, engaged multiple consulting firms with specialized knowledge for assistance, and spent millions of dollars trying to develop a successful product but could not, eventually declaring bankruptcy.  On information and belief, after Repairify purchased the assets of AES Technologies, LLC out of bankruptcy, Repairify "confirmed major deficiencies" with AES Technologies, LLC's product such as:  "significant lack of coverage, missing communication on the vehicle's on-board diagnostic system ('OBD II') port, inability to communicate with the medium speed BUS and most importantly the inability to deal effectively with the internet latency issues."  On information and belief, Repairify "could not find any proof that the previous owners had validated their claims about the effectiveness" of their product and stopped selling it.  On information and belief, Repairify spent over 12 months and millions of dollars, in addition to the time, money, and effort spent by AES Technologies LLC to address the deficiencies with the

---

[5] Repairify, Inc. v. AirPro Diagnostics LLC, Case No. 4:19-cv-01370 (S.D. Tex.), Dkt. No. 1 at ¶ 13.

product, which included testing hundreds of vehicles.[6]  Hence, any new entrant into the Remote Vehicle Diagnostics Market will have to spend a significant amount of time and capital to both develop and maintain its products and services.

111.    In addition, on information and belief, after the remote diagnostic products and service are developed, those products and services have to be constantly updated for every new vehicle model, new vehicle model year, or any time a vehicle manufacturer updates its vehicle software, which requires additional time, money, and effort.

112.    On information and belief, the other companies that compete in the Remote Vehicle Diagnostics Market such as Repairify, Opus IVS, and AirPro Diagnostics, each have U.S. patents related to providing remote diagnostics services.

113.    On information and belief, Repairify filed its patent infringement complaint against Elitek with the specific intent of harming competition in the Remote Vehicle Diagnostics Market for example, interfering with Elitek's business relationships, and acquiring and/or maintaining monopoly power within the Remote Vehicle Diagnostics Market.

114.    On information and belief, Repairify filed its patent infringement complaint only a few months after Elitek entered the Remote Vehicle Diagnostics Market in an attempt to thwart Elitek's ability to compete in the Remote Vehicle Diagnostics Market.  By filing a complaint asserting fraudulently acquired patents, Repairify engaged in anticompetitive and predatory conduct designed to illegally maintain and/or extend its monopoly power in the Remote Vehicle Diagnostics Market by attempting to and/or suppressing competition and producing anticompetitive effects.

---

[6] Repairify, Inc. v. AirPro Diagnostics LLC, Case No. 4:19-cv-01370 (S.D. Tex.), Dkt. No. 1 at ¶¶ 17-19.

115.     Repairify's willful maintenance of its monopoly power in the Remote Vehicle Diagnostic Market is directly tied to its use of the fraudulently obtained patents and knowing assertion of these fraudulently obtained patents.  For example, in addition to filing a patent infringement suit against Elitek, as another way to maintain its monopoly power, Repairify licensed its patents to Launch Tech Co., Ltd. ("LAUNCH"), a leading global supplier of automotive diagnostic tools and solutions in 2022.[7] Under this agreement, Repairify became LAUNCH's preferred service provider and is able to add LAUNCH's SmartLink remote diagnostic system into its product offerings, and thus maintaining Repairify's monopoly power in the Remote Vehicle Diagnostic Market.  Further, on information and belief based on publicly available information, Repairify entered into an exclusive long-term license agreement with Intelligent Technology Corp., Ltd. to bring Repairify's fraudulently patented remote diagnostic solutions to more places across the United States, reducing competition, and further maintaining Repairify's monopoly power in the Remote Vehicle Diagnostic Market.[8]

116.     On information and belief, Repairify is aware of Elitek's market share in the Remote Vehicle Diagnostics Market and that its market share in this market is significantly less than Repairify's market share.  On information and belief, Repairify was aware that by having a pending patent infringement complaint against Elitek, that it would be difficult for Elitek to maintain its existing customers as well as acquire new customers in the Remote Vehicle Diagnostics Market because customers are generally hesitant and/or unwilling to use a service that is being accused of infringing another's patents.  In fact, Elitek did lose at least one existing customer and at least one potential customer because of Repairify's lawsuit.  On information and

---

[7] https://www.kinderhook.com/press-release/repairify-and-launch-sign-global-patent-licensing-supply-agreement/
[8] https://astech.com/astech-autel-new-partnership/

belief, other companies are likely hesitant to enter the Remote Vehicle Diagnostics Market because of Repairify's assertion of fraudulently obtained patents, and that Repairify continues to inform other customers about this litigation in attempt to dissuade them from using Elitek's products and services. On information and belief, the loss of customers, potential customers, and the likelihood of losing additional customers due to Repairify's behavior has and will lead to higher costs and less competition in the Remote Vehicle Diagnostics Market. On information and belief, Repairify is using its lawsuit asserting fraudulently obtained patents for anticompetitive purposes in order to harm competition in the Remove Vehicle Diagnostics Market, including harm to Elitek, and to maintain its monopoly power.

117. Through its illegal anticompetitive conduct, Repairify has monopolized the Remote Vehicle Diagnostic Market and/or it has a specific intent to monopolize the Remote Vehicle Diagnostic Market, and, to the extent Repairify has not monopolized the market already, there is a dangerous probability that Repairify's attempt to monopolize the Remote Vehicle Diagnostic Market will be successful in violation of 15 U.S.C. § 2.

118. On information and belief, Repairify's illegal anticompetitive behavior forecloses existing competition within the Remote Vehicle Diagnostics Market and dissuades potential new entrants from entering the Remove Vehicle Diagnostics Market, resulting in reduction of competition of product output and/or raised prices to consumers.

119. Repairify's illegal anticompetitive conduct has caused and will continue to cause injury and anticompetitive effects in the Remove Vehicle Diagnostics Market as well as injury to Elitek in the form of, for example, loss of existing customers, loss of potential customers, reputational damage, lost time, lost profits, and attorney's fees expended defending against the frivolous claims of patent infringement.

120.     Elitek hereby seeks judgment in its favor that such anticompetitive practices are in violation of 15 U.S.C. § 2.

## COUNT II

(Monopolization and Attempted Monopolization - Sham Litigation)

121.     Elitek hereby re-alleges and incorporates by reference, as if fully set forth herein, the allegations of Paragraphs 1 through 120.

122.     Repairify has monopolized or engaged in activities with the specific intent to monopolize the Remote Vehicle Diagnostics product market (as defined above as providing vehicle diagnostics services to repair/collision shops from a remote location) in the geographic market defined as the United States (as determined through considerations of applicable regulations, vehicle availability, technical limitations, and where customers would look to source Remote Vehicle Diagnostics products), collectively the Remote Vehicle Diagnostics Market.

123.     Repairify has attempted to maintain its monopoly by knowingly asserting baseless claims of patent infringement with the intent that those claims, by themselves, would hinder competition in the Remote Vehicle Diagnostics Market and, and not just injure the recipients of those claims, but competition in the Remote Vehicle Diagnostics Market itself by discouraging competitors such that they were unable to offer competing solutions at competitive prices, or engaged in that activity with an intent to achieve monopoly power and, taken as a whole, have created a dangerous probability of achieving monopoly power.

124.     Repairify's complaint against Elitek constitutes sham litigation and subjects Repairify to the United States antitrust laws.  Repairify's allegations of infringement of the '313, '500, and '334 patents against Elitek were and are objectively baseless such that no reasonable litigant could realistically expect success on the merits, subjectively baseless in that Repairify

knew they were baseless, and were made not for a legitimate purpose of enforcing patent rights but to damage competition in the Remote Vehicle Diagnostics so that Repairify could maintain its monopoly power.

125.    As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because Repairify did not have standing to assert the '500 and '334 patents.  On information and belief, the previous owners of the '500 and '334 patents never executed an assignment to Repairify transferring the rights to those patents.  Hence, Repairify did not have standing to assert those patents against Elitek.

126.    As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because the '313, '500, and '334 patents are not infringed. Repairify's allegations of infringement are based on Elitek's use of features found in cited prior art such as Cohen and Pruzan that Repairify distinguished during prosecution.  It is not objectively reasonable to assert infringement against technology that was distinguished during prosecution.

127.    As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because the '313, '500, and '334 patents are invalid under 35 U.S.C. § 101.  The '313, '500, and '334 patents are directed toward the unpatentable abstract idea of remotely scanning and programming a vehicle.  The '313, '500, and '334 patents do not describe any new or improved connector, interface, tool, connection, protocol, network, or implementation thereof or describe any new or improved method of receiving, converting, or sending data.   That is, these patents use of conventional components performing routine tasks recited in the claims is not an inventive concept and does not transform the abstract idea claimed into patentable eligible subject matter.

128.     As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because the '313, '500, and '334 patents are invalid under 35 U.S.C. §§ 102, 103.  The PTO rejected patently indistinct claims during the prosecution history of the '183 application based on Asano, Hunt, Naima, and Knight (which were not disclosed in any of these patents).  In addition, the EPO rejected the claims of the European counterpart to these patents based on Gruhler, which was not considered during the '313 and '500 patents, and was only submitted to the PTO in the '334 patent application after the claims had been allowed.

129.     As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because the '313, '500, and '334 patents are invalid under 35 U.S.C. § 112.  The specification fails to teach one of ordinary skill in the art how to make and use the full scope of the claimed invention without experimentation.  On information and belief, Repairify should have been aware of this based on the significant time, money, and effort it took the inventors to develop a product, after they filed their patent application, which Repairify alleged still had major deficiencies.  And which, on information and belief, Repairify had to spend at least another year and millions of dollars to develop a suitable product based on the inventions.

130.     As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because the '313 patent is unenforceable due to inequitable conduct.  On information and belief, Repairify was aware that, during the prosecution of the '313 patent, the patentee made material misrepresentations with the intent to deceive the PTO and that the PTO relied on those misrepresentations and issued the '313 patent.  As described above, during the '313 patent prosecution, the patentee made material misrepresentations regarding the state of the art, the claims, and the prior art cited by the PTO.

131.    As discussed above, no reasonable litigant could reasonably allege infringement or realistically expect success on the merits because the '500 and '334 patents are unenforceable due to inequitable conduct.  On information and belief, Repairify was also aware the '500 and '334 patents were procured by fraud.  On information and belief, Repairify was aware that, during the prosecution of the '500 and '334 patents, the patentee was aware of material references but did not submit those references to the PTO with an intent to deceive the PTO, and if those references had been submitted, the PTO would not have issued the '500 and '334 patents.  As described above, the PTO twice rejected similar claims to the '500 and '334 patents during the prosecution of the '183 application using prior art (Asano, Naima, Hunt, and Knight) and rejected the patentee's argument trying to overcome these rejections.  Despite these rejections, the patentee did not submit these references (Asano, Naima, Hunt, or Knight) or the '183 application rejections to the examiner of the '500 and '334 patents, who was not involved in the prosecution of the '183 application.

132.    In performing its due diligence before filing its complaint against Elitek, on information and belief, Repairify knew about the futility of its claims.  And that its assertion of invalid and unenforceable patents (which it did not even own all of them) against non-infringing products was not objectively reasonable, but instead an attempt to maintain and/or increase its monopoly power in the Remote Vehicle Diagnostics Market.

133.    On information and belief, Repairify's complaint against Elitek is motivated by a subjective intent to abuse the litigation process for anticompetitive purposes such as interfering with Elitek's business, including interfering with Elitek's business relationships, rather than obtain judicial relief.

134.    For example, Repairify has intentionally and continually delayed the litigation against Elitek by seeking multiple extensions of time, extending the case schedule multiple times,

delaying or refusing to provide discovery, delaying settlement discussions, and refusing to engage the third-party manufacturer and supplier of the goods and services Elitek provides.  On information and belief, Repairify has used the on-going litigation (and its delay) to in an effort to allow the impediment of competition to remain as long as possible, including reducing Elitek's market share (or limiting its growth) while increasing its own market share (and increasing its growth) further indicating that Repairify brought its claims improperly not to seek redress but to use the litigation itself as tool to interfere with competition and to harm the competitive landscape of the Remote Vehicle Diagnostic Market.  On information and belief, Repairify inappropriate intent to use its litigation to interfere with Elitek is further evidenced by Repairify informing existing and potential Elitek's customers about the litigation in attempt to dissuade customers from using Elitek's products and services, reduce competition, and increase its revenue and market share.  And the longer the litigation continues, the more opportunity Repairify has to use the litigation to improperly dissuade customers from using Elitek's products and services.  Therefore, Repairify's anticompetitive conduct also caused harm to Elitek.

135.    On information and belief, Repairify possesses and currently exercises monopoly power in the Remote Vehicle Diagnostics Market as demonstrated by its high market share of the Remote Vehicle Diagnostics Market, high barriers to entry (as described below), ability to control prices for remote vehicle diagnostic services, existing business relationships, relative size to the other competitors, and ability to exclude competition.

136.    On information and belief, Repairify is owned by Kinderhook Industries LLC, a private investment firm that manages over $5.4 billion in committed capital.[9]  On information and

---

[9] January 11, 2022 Repairify press release entitled "asTech's Patented Rules Engine Noe Available to Help Repairers Affirm OEM & OEM-Compatible Scans for Insurance Carrier Reimbursement." *See* https://astech.com/astechs-patented-rules-engine-is-now-available/.

belief, Repairify received a strategic investment from 3M, a Fortune 500 company with $35.4 billion in total sales in 2021, to help "further expand and accelerate its proprietary tools, technology, and service offerings."[10] On information and belief based on Repairify's press release, Repairify completed more than 12.4 million automotive diagnostic scans and delivered over 4.9 million diagnostic reports in 2021."[11] On information and belief based on Repairify's website, Repairify has over 400 technicians, over 1000 OEM scan tools, and has scanned over 5 million vehicles.[12] On information and belief based on publicly available sources, Repairify's revenue is estimated to be over $100 million per year.

137. On information and belief based on publicly available information, Repairify promotes itself as the "market leader in the automotive repair industry through sales of its innovative and reliable remote scanning devices."[13] On information and belief, Repairify has over 50% of the Remote Vehicle Diagnostics Market, giving it the largest market share of the companies competing in the Remote Vehicle Diagnostics Market. On information and belief, Repairify's market share is over 20 times larger than Elitek's market share in the Remote Vehicle Diagnostics Market. On information and belief, Repairify has the ability to undercut its competitors' pricing.

138. On information and belief, there are significant barriers for entry into the Remote Vehicle Diagnostics Market. On information and belief, it takes a significant investment in time and money to develop the infrastructure, software, and tools needed for remote vehicle diagnostics. For example, on information and belief, AES Technologies, LLC (the predecessor to Repairify) spent about four years, engaged multiple consulting firms with specialized knowledge for

---

[10] https://www.kinderhook.com/press-release/astech-receives-strategic-investment-from-3m/; https://fortune.com/company/3m/fortune500/
[11] March 24, 2022 Repairify press release entitled "Repairify completed 12.4M diagnostics scans in record 2021." https://astech.com/repairify-completed-12-4m-diagnostic-scans-in-record-2021/.
[12] https://astech.com/about/
[13] Repairify, Inc. v. AirPro Diagnostics LLC, Case No. 4:19-cv-01370 (S.D. Tex.), Dkt. No. 1 at ¶ 13.

assistance, and spent millions of dollars trying to develop a successful product but could not, eventually declaring bankruptcy. On information and belief, after Repairify purchased the assets of AES Technologies, LLC out of bankruptcy, Repairify "confirmed major deficiencies" with AES Technologies, LLC's product such as: "significant lack of coverage, missing communication on the vehicle's on-board diagnostic system ('OBD II') port, inability to communicate with the medium speed BUS and most importantly the inability to deal effectively with the internet latency issues." On information and belief, Repairify "could not find any proof that the previous owners had validated their claims about the effectiveness" of their product and stopped selling it. On information and belief, Repairify spent over 12 months and millions of dollars, in addition to the time, money, and effort spent by AES Technologies LLC to address the deficiencies with the product, which included testing hundreds of vehicles.[14] Hence, any new entrant into the Remote Vehicle Diagnostics Market will have to spend a significant amount of time and capital to both develop and maintain its products and services.

139. In addition, on information and belief, after the remote diagnostic products and service are developed, those products and services have to be constantly updated for every new vehicle model, new vehicle model year, or any time a vehicle manufacturer updates its vehicle software, which requires additional time, money, and effort.

140. On information and belief, the other companies that compete in the Remote Vehicle Diagnostics Market such as Repairify, Opus IVS, and AirPro Diagnostics, each have U.S. patents related to providing remote diagnostics services.

141. On information and belief, Repairify filed its patent infringement complaint against Elitek with the specific intent of harming competition in the Remote Vehicle Diagnostics Market,

---

[14] Repairify, Inc. v. AirPro Diagnostics LLC, Case No. 4:19-cv-01370 (S.D. Tex.), Dkt. No. 1 at ¶¶ 17-19.

including, for example, interfering with Elitek's business relationships, and acquiring and/or maintaining monopoly power within the Remote Vehicle Diagnostics Market.

142.    On information and belief, Repairify filed its patent infringement complaint only a few months after Elitek entered the Remote Vehicle Diagnostics Market in an attempt to thwart Elitek's ability to compete in the Remote Vehicle Diagnostics Market.  By filing a complaint asserting unenforceable, invalid, and not-infringed patents (including two patents that it did not own), Repairify engaged in anticompetitive and predatory conduct designed to illegally maintain and/or extend its monopoly power in the Remote Vehicle Diagnostics Market by attempting to and/or suppressing competition and producing anticompetitive effects.

143.    Furthermore, in 2022, as a way to maintain its monopoly power, Repairify licensed its patents to Launch Tech Co., Ltd. ("LAUNCH"), a leading global supplier of automotive diagnostic tools and solutions.[15] Under this agreement, Repairify became LAUNCH's preferred service provider and is able to add LAUNCH's SmartLink remote diagnostic system into its product offerings, and thus maintaining Repairify's monopoly power in the Remote Vehicle Diagnostic Market.  Further, on information and belief based on publicly available information, Repairify entered into an exclusive long-term license agreement with Intelligent Technology Corp., Ltd. to bring Repairify's remote diagnostic solutions to more places across the United States, reducing competition, and further maintaining Repairify's monopoly power in the Remote Vehicle Diagnostic Market.[16]

144.    On information and belief, Repairify is aware of Elitek's market share in the Remote Vehicle Diagnostics Market and that its market share in this market is significantly less

---

[15] https://www.kinderhook.com/press-release/repairify-and-launch-sign-global-patent-licensing-supply-agreement/
[16] https://astech.com/astech-autel-new-partnership/

than Repairify's market share. On information and belief, Repairify was aware that by having a pending patent infringement complaint against Elitek, that it would be difficult for Elitek to maintain its existing customers as well as acquire new customers in the Remote Vehicle Diagnostics Market because customers are generally hesitant and/or unwilling to use a service that is being accused of infringing another's patents. In fact, Elitek did lose at least one existing customer and at least one potential customer because of Repairify's lawsuit. On information and belief, other companies are likely hesitant to enter the Remote Vehicle Diagnostics Market because of Repairify's assertion of unenforceable, invalid, and non-infringed patents, and that Repairify continues to inform other customers about this litigation in attempt to dissuade them from using Elitek's products and services. On information and belief, the loss of customers, potential customers, and the likelihood of losing additional customers due to Repairify's behavior has and will lead to higher costs and less competition in the Remote Vehicle Diagnostics Market. On information and belief, Repairify is using its lawsuit asserting unenforceable, invalid, and non-infringed patents for anticompetitive purposes in order to harm the competition in the Remote Vehicle Diagnostics Market and to maintain its monopoly power.

145. Through its illegal anticompetitive conduct, Repairify has monopolized the Remote Vehicle Diagnostics Market and/or it has a specific intent to monopolize the Remote Vehicle Diagnostic Market, and there is a dangerous probability that Repairify's attempt to monopolize the Remote Vehicle Diagnostic Market will be successful in violation of 15 U.S.C. § 2.

146. On information and belief, Repairify's illegal anticompetitive behavior forecloses existing competition within the Remote Vehicle Diagnostics Market and dissuades potential new entrants from entering the Remote Vehicle Diagnostic Market, resulting in the reduction of product output and/or raised prices to consumers.

147.     Repairify's illegal anticompetitive conduct has caused and will continue to cause anticompetitive effects in the Remote Vehicle Diagnostics Market injury to Elitek in the form of, for example, loss of existing customers, loss of potential customers, attorney's fees, and lost time and money spent defending against Repairify's frivolous lawsuit.

148.     Elitek hereby seeks judgment in its favor that such anticompetitive practices are in violation of 15 U.S.C. § 2.

## COUNT III

(Deceptive Trade Practices)

149.     Elitek hereby re-alleges and incorporates by reference, as if fully set forth herein, the allegations of Paragraphs 1 through 148.

150.     Elitek and Repairify are direct competitors in the Remote Vehicle Diagnostics Market, including Illinois.

151.     On information and belief, Repairify knew or should have known that it does not own the '500 and '334 patents and that the '313, '500, and '334 patents were not infringed by, invalid, and/or unenforceable against Elitek.

152.     On information and belief, Repairify knew or should have known that filing its complaint against Elitek with respect to the '313, '500, and '334 patents were also in violation of the antitrust law of the United States, as discussed above.

153.     On information and belief, Repairify has and continues to assert via its complaint that it owns the '500 and '334 patents when it does not and that Elitek has infringed and continues to infringe the '313, '500, and '334 patents when Repairify knew or should have known the '313, '500, and '334 patents were not infringed by, invalid, and/or unenforceable against Elitek, and/or by doing so was in violation of federal antitrust laws.

154.     Third parties, such as consumers of remote vehicle diagnostics services and other competitors, in the Remote Vehicle Diagnostic Market are aware of Repairify's false, misleading, and/or disparaging acts described above including the allegations it made in its litigation against Elitek, which have harmed Elitek's business through, at least, lost business from at least one existing customer who after becoming aware of Repairify's statements in its lawsuit against Elitek (by Repairify) decided to stop using Elitek's products and services, and, instead, use Repairify's products and services and lost business opportunities from another potential customer who after being made aware of Repairify's statements in its lawsuit against Elitek (by Repairify) chose not to do business with Elitek and instead chose to use Repairify's products and services. On information and belief, Elitek has lost other customers due to Repairify's lawsuit. On information and belief, Repairify disclosed the lawsuit to these customers and potential customers with the intent of damaging Elitek and gaining these customers for its own business.

155.     On information and belief, Repairify's complaint against Elitek, which was objectively baseless, as described above, was made in bad faith.

156.     On information and belief, Repairify's actions, as described above, were false, misleading, and/or disparaging and, thus, violated Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 et seq.

157.     Repairify's actions, as described above, unfairly interfere with Elitek's ability to compete with Repairify on the merits of their products and unfairly interferes with Elitek's business and business opportunities with respect to its products and services in violation of 815 ILCS 510 et seq.

158.     Elitek has suffered and will continue to suffer harm because of Repairify's deceptive trade practices, including incurred reputational damage, lost customers, lost time, and lost profits.

## COUNT IV

(Common Law Unfair Competition)

159.     Elitek hereby re-alleges and incorporates by reference, as if fully set forth herein, the allegations of Paragraphs 1 through 158.

160.     Elitek reasonably expected to sell and continue to sell its non-infringing products and services, enter into business relationships related to its non-infringing products and services, and explore business opportunities related to its non-infringing products and services.   On information and belief, Repairify intentionally disclosed the existence of the lawsuit to current and prospective customers and used the existence of the lawsuit to cause those customers to stop (or not use) Elitek, and instead to use Repairify.  Repairify's actions have wrongfully interfered with Elitek's legitimate expectancy and has caused it harm by interfering with Elitek's business, including lost business and business opportunities.

161.     On information and belief, Repairify knew or should have known that it does not own the '500 and '334 patents and that the '313, '500, and '334 patents were not infringed by, invalid, and/or unenforceable against Elitek.

162.     On information and belief, Repairify knew or should have known that its action with respect to the '313, '500, and '334 patents were also in violation of the antitrust laws of the United States, as discussed above.

163.     On information and belief, Repairify has and continues to assert via its complaint that it owns the '500 and '334 patents and that Elitek has infringed and continues to infringe the

'313, '500, and '334 patents when Repairify knew or should have known the '313, '500, and '334 patents were not infringed by, invalid, and/or unenforceable against Elitek, and/or that by doing so was in violation of Federal Antitrust laws.

164. Because of Repairify's actions, Elitek lost at least one existing customer who after being made aware of Repairify's statements in its lawsuit against Elitek (by Repairify) stopped using Elitek's products and services, and, instead, began using Repairify's products and services, and lost business opportunities from another potential customer who after being made aware of Repairify's statements in its lawsuit against Elitek (by Repairify) chose not to do business with Elitek and instead chose to use Repairify's products and services. On information and belief, Elitek has lost other customers due to Repairify's lawsuit.

165. On information and belief, Repairify's allegations of infringement against Elitek in its lawsuit were objectively baseless and, as described above, were made in bad faith.

166. On information and belief, Repairify's actions, as described above, constitute unlawful and/or unfair business practices in an effort to gain an unfair competitive advantage over Elitek that have wrongfully interfered with Elitek's business in violation of unfair competition under Illinois law.

167. Elitek has suffered and will continue to suffer harm because of Repairify's unfair competition in the form of lost business, lost profits, and lost business opportunities.

## <u>COUNT V</u>

(Tortious Interference with Current and Prospective Business Relationships)

168. Elitek hereby re-alleges and incorporates by reference, as if fully set forth herein, the allegations of Paragraphs 1 through 167.

169.    As part of Elitek's business, Elitek provides its remote diagnostics products and services to customers.  Elitek also advertises and seeks additional customers for its remote diagnostics products and services.

170.    As a result of Repairify's action, as described above, Elitek lost current and prospective business relationships.  On information and belief, Repairify was aware of Elitek's customers and potential customers.  On information and belief, Repairify intentionally induced or caused disruption to Elitek's current and prospective business relationships, including by the actions described above, and by disclosing the existence of the lawsuit to current and prospective business relationships and using the existence of the lawsuit to disrupt Elitek's current and prospective business relationships.  On information and belief, Repairify disrupted Elitek's current and prospective business relationships with an intent to harm Elitek.

171.    On information and belief, Repairify disrupted Elitek's current and prospective business relationships by improper means, by asserting and continuing to assert via its complaint that it owns the '500 and '334 patents and that  Elitek has infringed and continues to infringe the '313, '500, and '334 patents when Repairify knew or should have known the '313, '500, and '334 patents were not infringed by, invalid, and/or unenforceable against Elitek, and/or by doing so, it was in violation of federal antitrust laws.

172.    For example, Elitek lost at least one existing customer who after being made aware of Repairify's statements in its lawsuit against Elitek (by Repairify) chose to no longer use Elitek's products and services, and instead, use Repairify's products and services, and lost business opportunities from another potential customer who after being made aware of Repairify's statements in its lawsuit against Elitek (by Repairify) chose not to do business with Elitek and

instead chose to use Repairify's products and services. On information and belief, Elitek has lost other customers due to Repairify's lawsuit.

173.    On information and belief, Repairify was aware of and/or anticipated these customers and business opportunities and filed its complaint for the purpose of interfering with them. On information and belief, Repairify's conduct with respect to these business and business opportunities was intentional interference. Because of Repairify's conduct, Elitek was harmed because it lost existing and potential customers, incurred attorney's fees, reputational damage, lost time, and lost profits.

174.    On information and belief, Repairify's allegations of infringement against Elitek in its lawsuit were objectively baseless and, as described above, were made in bad faith.

175.    On information and belief, Repairify's actions, as described above, constitute tortious interference with existing and prospective business of Elitek in violation of Illinois law.

176.    Elitek has suffered and will continue to suffer harm because of Repairify's tortious interference with existing and prospective business relationships in the form of lost business, lost profits, and lost business opportunities.

**PRAYER FOR RELIEF**

WHEREFORE, Elitek prays that the Court enter judgment:

A.    in favor of Elitek and against Repairify;

B.    find Repairify violated 15 U.S.C. § 2;

C.    award damages and/or restitution to Elitek sufficient to compensate Elitek for Repairify violation of 15 U.S.C. § 2, in an amount to be proven at trial pursuant to 15 U.S.C. § 15, including trebled damages, attorney's fees and prejudgment interest;

      D.      enjoin Repairify, pursuant to 15 U.S.C. § 26, from asserting the '313, '500, and '334 patents against Elitek, its suppliers, or its customers, and from making any further allegations that Elitek's products and services have infringed or are infringing the '313, '500, and '334 patents;

      E.      find Repairify violated 815 ILCS 510 and award damages to Elitek in an amount to be proven at trial, attorney's fees, costs, and enjoin Repairify from making any further allegations that Elitek's products and services have infringed or are infringing the '313, '500, and '334 patents;

      F.      find Repairify engaged in unfair competition under Illinois law and award damages to Elitek in an amount to be proven at trial, attorney's fees, costs, and enjoin Repairify from making any further allegations that Elitek's products and services have infringed or are infringing the '313, '500, and '334 patents;

      G.      find Repairify engaged in tortious interference with existing and prospective business relationships under Illinois law and award damages to Elitek in an amount to be proven at trial, attorney's fees, costs, and enjoin Repairify from making any further allegations that Elitek's products and services have infringed or are infringing the '313, '500, and '334 patents;

      H.      awarding Elitek its costs in this action; and

      I.      granting such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Elitek demands a trial by jury on all issues triable by jury.


Dated:  April 28, 2023                              Respectfully submitted,


                                                    By: */s/ Barry F. Irwin*
                                                    Barry F. Irwin, P.C.
                                                    Joseph Saltiel
                                                    **IRWIN IP LLP**
                                                    150 N. Wacker Dr., Suite 700
                                                    Chicago, IL 60606
                                                    (312) 667-6080 (Telephone)
                                                    birwin@irwinip.com
                                                    jsaltiel@irwinip.com

                                                    *Attorneys for Defendant Keystone Automotive
                                                    Industries, Inc. d/b/a Elitek Vehicle Service*s