IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEYSTONE AUTOMOTIVE INDUSTRIES, INC. d/b/a ELITEK VEHICLE SERVICES, | ) ) ) ) | Case No. 1:23-cv-02689 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| REPAIRIFY, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS OR STAY**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.    BACKGROUND .................................................................................................... 2

    A.    Repairify's Patent Infringement Action in the Western District of Texas.............. 2

    B.    Elitek's Antitrust Claims...................................................................................... 3

III.    LEGAL STANDARD.............................................................................................. 3

IV.    ARGUMENT .......................................................................................................... 5

    A.    All Counts of the Complaint Are Compulsory Counterclaims That Should Have Been Filed in the WDTX Case......................................................... 5

    B.    The Complaint Should be Dismissed under Rule 13(a) and Rule 12(b)(3)............ 8

    C.    Alternatively, the Case Should be Stayed Pending WDTX Resolution ................ 8

    D.    Counts I and II Fail to Adequately Plead Antitrust Liability.................................. 9

        1.    Elitek Fails to Plausibly Allege a Relevant Market ................................. 10

            i.    Elitek's Exclusion of Mobile Vehicle Diagnostics is Implausible .................................................................. 11

            ii.    Elitek's Exclusion of OEM Scan Tools is Implausible ................ 13

            iii.    Elitek's Exclusion of Aftermarket Scan Tools is Implausible...... 13

            iv.    Elitek's Conclusory Cross-Elasticity Allegations Fail ................. 14

            v.    Elitek's Own Allegations Demonstrate that the Proposed Market is Facially Implausible...................................... 15

V.    CONCLUSION...................................................................................................... 15

## TABLE OF AUTHORITIES

**Federal Cases**

*Apple, Inc. v. Psystar Corp.*,
 586 F. Supp. 2d 1190 (N.D. Cal. 2008) .................................................................................. 14

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
 846 F.3d 1297 (10th Cir. 2017) ................................................................................................ 14

*Collins v. Associated Pathologists, Ltd.*,
 844 F.2d 473 (7th Cir. 1988) .................................................................................................... 10

*Cummins, Inc. v. TAS Distrib. Co.*,
 700 F.3d 1329 (Fed. Cir. 2012) .................................................................................................. 8

*Geinosky v. City of Chicago*,
 675 F.3d 743 (7th Cir. 2012) .................................................................................................... 13

*Henry v. Farmer City State Bank*,
 808 F.2d 1228 (7th Cir. 1986) .................................................................................................... 8

*In re Groupon Derivative Litig.*,
 882 F. Supp. 2d 1043 (N.D. Ill. 2012) .................................................................................... 5, 9

*Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*,
 No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ............................................ 10, 14

*Markel American Ins. Co. v. Dylan*,
 787 F. Supp. 2d 776 (N.D. Ill. 2011) ......................................................................................... 5

*Martino v. McDonald's Sys., Inc.*,
 598 F. 2d 1079 (7th Cir. 1979) ............................................................................................. 3, 4

*Murata Mach. USA v. Daifuku Co.*,
 830 F.3d 1357 (Fed. Cir. 2016) ............................................................................................. 5, 9

*Nobelpharma AB v. Implant Innovations, Inc.*,
 141 F.3d 1059 (Fed. Cir. 1998) ............................................................................................. 4, 5

*Preci-Dip, SA v. Tri-Star Elecs. Int'l, Inc.*,
 No. 08 C 4192, 2008 WL 5142401 (N.D. Ill. Dec. 4, 2008) ................................................. 4, 8

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
 381 F.3d 717 (7th Cir. 2004) ............................................................................................. 10, 12

*SDMS, Inc. v. Rocky Mountain Chocolate Factory, Inc.*,
 No. 08 CV 0833 JM AJB, 2008 WL 4838557 (S.D. Cal. Nov. 6, 2008) ............................... 4, 8

*Spectrum Sports, Inc. v. McQuillan*,
 506 U.S. 447 (1993) ................................................................................................ 5, 10

*U.S. Philips Corp. v. Sears, Roebuck & Co.*,
 No. 85 C 5366, 1987 WL 26123 (N.D. Ill. Dec. 2, 1987), *aff'd*, 55 F.3d 592 (Fed. Cir.
 1995) ................................................................................................................... 4, 7, 8

*USM Corp. v. SPS Techs., Inc.*,
 102 F.R.D. 167 (N.D. Ill. 1984) ............................................................................ 3, 4, 7, 8

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
 382 U.S. 172 (1965) ................................................................................................ 5, 6, 8

**Federal Rules**
Fed. R. Civ. P. 12 ................................................................................................................ 4, 8

Fed. R. Civ. P. 13 ................................................................................................................ 3, 4, 8

Defendant Repairify, Inc. ("Repairify") submits this Memorandum in support of its motion to dismiss Plaintiff Keystone Automotive Industries, Inc.'s ("Elitek")[1] complaint, or in the alternative, stay this Action under Rules 12(b) and 13 of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

Elitek's complaint against Repairify alleges antitrust violations and state law torts based on actions related to the prosecution and enforcement of three Repairify patents. Elitek filed suit in the wrong court. Repairify first sued Elitek for infringing those three patents in the Western District of Texas ("WDTX") nearly *two years ago*. Elitek responded with affirmative defenses and declaratory judgment counterclaims of invalidity and inequitable conduct based on the *very same* factual allegations it now brings in this second-filed action.[2] But the claims Elitek brings in the present case are compulsory counterclaims to the WDTX case. Elitek had until November 9, 2022—approximately *fifteen months* from the beginning of the WDTX case—to amend its pleading and bring its antitrust claims. Ex. A, [WDTX Dkt. 58]. Elitek failed to amend and did not even seek leave to do so. Instead, Elitek sat on its hands for another *five months* to file this second case. Elitek's belated attempt to bring compulsory counterclaims in this Court is nothing more than forum shopping and an attempted end-run around the WDTX court's scheduling order—and at the great expense of additional judicial and party resources. This Court should dismiss this case, declining Elitek's invitation to revisit the same factual and legal issues that have been before the WDTX for nearly a year and are set for resolution at trial in ten months.

---

[1] Plaintiff does business as "Elitek" and refers to itself under that name in its Complaint.
[2] Elitek later amended its pleading on October 26, 2022 including a defense that Repairify lacked standing to assert the patents-in-suit. Ex. B [WDTX Dkt. 57]

In addition, the Court should find that Elitek has not, and cannot, adequately plead a plausible relevant product market as required for its antitrust claims based on threadbare allegations that are nothing more than legal conclusions couched as facts.

II.    **BACKGROUND**

    **A. Repairify's Patent Infringement Action in the Western District of Texas**

Repairify's U.S. Patent Nos. 8,688,313; 9,684,500; and 10,528,334 claim systems and methods that permit a technician to service and program vehicles from a remote location, using the vehicle's on-board diagnostics (OBD) interface. Nearly two years ago, on August 9, 2021, Repairify filed a patent infringement complaint in the U.S. District Court for the Western District of Texas (the "WDTX Case") accusing Elitek of infringing Repairify's '313, '500, and '334 patents, by providing infringing goods or services. Ex. C, Repairify WDTX Complaint.

Elitek responded to the complaint by filing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), which was denied on July 6, 2022. Ex. D [WDTX Dkt. 49]. After the court denied Elitek's motion to dismiss, Elitek filed an Amended Answer and Counterclaims on October 26, 2022, denying infringement and alleging invalidity of the '313, '500, and '334 patents. Ex. B [WDTX Dkt. 57]. Elitek's Answer also included defenses and counterclaims alleging that the '313, '500, and '334 patents were unenforceable due to inequitable conduct committed by prosecuting counsel during proceedings before the Patent Office: (1) Defenses 9 and 12 and Counterclaim VII ('313 patent), Ex. B at 36–41, 53–54, 60–61 [WDTX Dkt. 57]; (2) Defenses 10 and 11 and Counterclaim VIII ('500 patent), Ex. B at 41–53, 61 [WDTX Dkt. 57]; (3) Defenses 10 and 11 and Counterclaim IX ('334 patent), Ex. B at 41–53, 62 [WDTX Dkt. 57]. The inequitable conduct defenses and counterclaims were based on allegations that: (a) prosecuting counsel made misleading remarks to the Patent Office concerning the state of the art and concerning Pruzan, U.S. Patent No. 6,728,603 (Ex. B at 36–41); and (b) prosecuting

counsel failed to disclose material references to the Patent Office (Ex. B at 42–53). Elitek also alleged that Repairify lacked standing to assert the '500 and '334 patents on the basis that it did not own those patents at the time the complaint was filed. Ex. B at 54 (Defense 13).

The WDTX Case has proceeded through claim construction and fact discovery, which is set to close next month on August 18, 2023. The parties' agreed (and court-ordered) deadline to amend the pleadings was November 9, 2022, fifteen months after the complaint was filed. Ex. E, Scheduling Order [WDTX Dkt. 59]. The court conducted a *Markman* hearing on July 6, 2022 but has not yet issued a claim construction ruling. Expert discovery is set to begin on September 15, 2023, and trial is scheduled to begin on May 6, 2024. *See* Ex. F, Scheduling Order dated April 13, 2023 [WDTX Dkt. 99]; Ex. H, [WDTX Dkt. 50].

### B. Elitek's Antitrust Claims

Elitek filed its Complaint alleging violation of antitrust laws and related counts in this Court on April 28, 2023. Dkt. 1. Each of the counts of the Complaint is based on the same facts alleged by Elitek in the WDTX a year ago, in support of its defenses of unenforceability of the '313, '500, and '334 patents based on alleged inequitable conduct, and lack of standing to assert the '500 and '334 patents. Dkt. 1 at ¶¶ 21–99.

### III. LEGAL STANDARD

A counterclaim is compulsory under Rule 13(a) if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" or if it is "logically related." Fed. R. Civ. P. 13(a); *USM Corp. v. SPS Techs., Inc.*, 102 F.R.D. 167, 170 (N.D. Ill. 1984). Compulsory counterclaims "are lost if not raised at the proper time." *Martino v. McDonald's Sys., Inc.*, 598 F. 2d 1079, 1082 (7th Cir. 1979) (affirming dismissal of antitrust claims). "The primary purpose of the rule is to reduce the costs of litigation, to the parties and to the courts, by forcing closely related claims to be combined in a single lawsuit." *U.S. Philips Corp.*

3

*v. Sears, Roebuck & Co.*, No. 85 C 5366, 1987 WL 26123 (N.D. Ill. Dec. 2, 1987), *aff'd*, 55 F.3d 592 (Fed. Cir. 1995).

In a patent infringement case, an antitrust claim based on inequitable conduct allegedly committed during prosecution of the asserted patent is a compulsory counterclaim under Rule 13(a) and must be raised during the infringement litigation. *USM Corp.*, 102 F.R.D. at 170 ("USM now seeks to hold SPS liable under the antitrust laws based upon the same allegations of fraudulent procurement. That claim … should have been raised in the [] infringement litigation."); *U.S. Philips Corp.*, 1987 WL 26123 at *4 (determining that accused infringer "was required to bring its antitrust counterclaim in the [earlier-filed infringement] proceeding" because it was a compulsory counterclaim); *U.S. Philips Corp.*, 55 F.3d at 597 ("the place to challenge litigation as sham is in the asserted sham litigation"); *see also Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ("[A]n antitrust claim … is typically raised as a counterclaim by a defendant in a patent infringement suit.").

A claim that should have been filed earlier as a compulsory counterclaim in a pending action should be dismissed under Rule 13(a) and Rule 12(b)(3) or 12(b)(6) of the Federal Rules of Civil Procedure. Alternatively, the court in the later-filed action may stay its proceedings until resolution of the earlier case. *See Martino*, 598 F. 2d at 1082; *Preci-Dip, SA v. Tri-Star Elecs. Int'l, Inc.*, No. 08 C 4192, 2008 WL 5142401 (N.D. Ill. Dec. 4, 2008) (granting motion to dismiss under Rule 12(b)(3)); *SDMS, Inc. v. Rocky Mountain Chocolate Factory, Inc.*, No. 08 CV 0833 JM AJB, 2008 WL 4838557 at *2 (S.D. Cal. Nov. 6, 2008) ("Depending on the finality of the disposition in the former court, the court hearing the second action may stay its proceedings or dismiss the claims with leave to amend in the prior action.").

4

"The ability to stay cases is an exercise of a court's inherent power to manage its own docket." *Murata Mach. USA v. Daifuku Co.*, 830 F.3d 1357, 1361 (Fed. Cir. 2016). In deciding whether to grant a stay, "courts balance the competing interests of the parties and the interest of the judicial system." *Markel American Ins. Co. v. Dylan*, 787 F. Supp. 2d 776, 779 (N.D. Ill. 2011). "Courts generally consider three factors when determining whether to grant a stay: (1) whether a stay will simplify the issues in question and streamline the trial; (2) whether a stay will reduce the burden of litigation on the parties and on the court; and (3) whether a stay will unduly prejudice or tactically disadvantage the non-moving party." *In re Groupon Derivative Litig.*, 882 F. Supp. 2d 1043, 1045 (N.D. Ill. 2012).

To prevail on a *Walker Process* claim (Complaint Count I), the antitrust plaintiff must prove that the asserted patent was obtained through knowing and willful fraud under *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965). For a "sham litigation" claim (Complaint Count II), the antitrust plaintiff must prove that "the infringement suit was a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Nobelpharma*, 141 F.3d at 1068 (quotation marks and citation omitted. For each of these claims, the plaintiff must also satisfy the other elements of a Sherman Act monopolization claim: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

IV.     **ARGUMENT**

       A.     **All Counts of the Complaint Are Compulsory Counterclaims That Should Have Been Filed in the WDTX Case**

Counts I–V of the Complaint are all compulsory counterclaims that should been filed in the WDTX Case because they arise "out of the transaction or occurrence that is the subject

5

matter" of, and are "logically related" to, Repairify's infringement suit—namely Repairify's prosecution and assertion of its patent rights.

Count I is a *Walker Process* claim, based on allegations that Repairify "knowingly asserted fraudulently obtained patents." The alleged fraud is based on allegedly misleading arguments made before the Patent Office during prosecution of the '313, '500, and '334 patents (*see* Dkt. 1 ¶¶ 24–32, 46–52) and based on prosecuting counsel's alleged failure to disclose certain references to the Patent Office (*see* Dkt. 1 ¶¶ 53–87). These allegations underlying Elitek's antitrust claims are virtually identical to the allegations Elitek raised in its defenses and counterclaims of unenforceability of the '313, '500, and '334 patents, in Elitek's Answer filed in the WDTX Case more than eight months ago, October 26, 2022, confirming that they arise out of the same transaction or occurrence as the WDTX Case. *See* Ex. B at 36–54, 60–62 (unenforceability: Defenses 9, 10, 11, 12; Counterclaims VII, VIII, IX).

Count II is a "sham litigation" claim, also based on the same allegations of fraud underlying Count I, as well as allegations that Repairify did not have standing to assert the '500 and '334 patents, and that the patents are invalid and not infringed. *See, e.g.*, Dkt. 1 ¶¶ 45, 125 (standing); 84–92, 127–129 (invalidity); 93, 126 (non-infringement); 130–131 (inequitable conduct). Elitek already made these allegations in its defenses and counterclaims of unenforceability of the '313, '500, and '334 patents, in Elitek's Answer in the WDTX Case, confirming that they arise out of the same transaction or occurrence as the WDTX Case. *See* Ex. B at 34–35, 56–60 (non-infringement and invalidity: Defenses 1, 2; Counterclaims I, II, III, IV, V, VI); 36–54, 60–62 (unenforceability: Defenses 9, 10, 11, 12; Counterclaims VII, VIII, IX); 54 (standing: Defense 13).

Count III (Deceptive Trade Practices), Count IV (unfair competition), and Count V (tortious interference) are all based on the same underlying alleged facts as Counts I and II. *See, e.g.*, Count III, ¶¶ 151, 153 (referring to ownership, non-infringement, invalidity, and unenforceability), 152 (referring to "violation of the antitrust law of the United States, discussed above"); Count IV, ¶¶ 161, 163 (referring to ownership, non-infringement, invalidity, and unenforceability), 162 (referring to "violation of the antitrust law of the United States, discussed above"); Count V, ¶¶ 171 (referring to non-infringement, invalidity, and unenforceability), 174 (referring to "objectively baseless" and "bad faith" allegations of infringement by Repairify).

Thus, each of Counts I–V arises "out of the transaction or occurrence that is the subject matter" of Repairify's infringement suit and should have been raised as compulsory counterclaims in the WDTX Case. *U.S. Philips Corp.*, 1987 WL 26123 at *5 ("Permitting [plaintiff] to raise the very antitrust counterclaim which it had available to it, and indeed was required to raise, in the prior action would result in an impermissible splitting of the same basic controversy between the [prior] suit and the one at bar, and an untenable waste of judicial resources."); *USM Corp.*, 102 F.R.D. at 170 ("Since the fraud allegations necessary to invalidate the [asserted] patent are identical to the fraud allegations which provide the basis for the antitrust claim, there can be no doubt that these claims, although grounded in different legal theories, are essentially identical." (citation omitted).

Indeed, Elitek raised all of the underlying factual allegations supporting its Counts of the complaint in its defenses and counterclaims asserted in its Answer filed in the WDTX Case, confirming that they arise out of the same transaction or occurrence. Elitek could have included Counts I–V as counterclaims at the time it filed its Answer in that case, or could have sought leave to do so at a later time, but did not. All of Elitek's claims in this case "should have been

7

raised in the [WDTX] infringement litigation." *USM Corp.*, 102 F.R.D. at 170; *accord U.S. Philips Corp.*, 1987 WL 26123 at *4.

### B. The Complaint Should be Dismissed under Rule 13(a) and Rule 12(b)(3)

"Illinois courts have determined not to engage in piecemeal presentation of defenses and we give deference to this sound policy." *Cummins, Inc. v. TAS Distrib. Co.*, 700 F.3d 1329, 1337 (Fed. Cir. 2012) (internal quotations omitted); quoting *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1234 (7th Cir. 1986) ("Just as the policies behind the doctrine of res judicata are designed to discourage the piecemeal litigation of claims, so are they designed to prevent the piecemeal presentation of defenses."). Because Elitek's antitrust claims should have been raised as counterclaims in the WDTX Case, they should be dismissed in this case under Rule 13 and Rule 12(b)(3), for improper venue. *See USM Corp.*, 102 F.R.D. at 168–171 (dismissing *Walker Process* claims under Rule 13(a) and res judicata); *U.S. Philips Corp.*, 1987 WL 26123 at *5 (granting summary judgment on antitrust claims that should have been raised as counterclaims in prior action); *Preci-Dip, SA*, 2008 WL 5142401 (granting motion to dismiss unfair competition claims under Rule 12(b)(3), without prejudice to refiling in the earlier-filed infringement action); *see also SDMS, Inc.*, 2008 WL 4838557 at *2 ("Depending on the finality of the disposition in the former court, the court hearing the second action may stay its proceedings or dismiss the claims with leave to amend in the prior action.").

### C. Alternatively, the Case Should be Stayed Pending WDTX Resolution

Alternatively, this case should be stayed pending resolution of the WDTX Case. *See SDMS, Inc.*, 2008 WL 4838557 at *2 (staying case in response to motion to dismiss under Rule 12(b)(6), because "the questions are sufficiently related to the subject matter before [the court in the earlier-filed case] to qualify as Rule 13 compulsory counterclaims . . . ."). Repairify asked Elitek to stipulate to a stay, but Elitek demanded Repairify waive its right to seek dismissal and

8

instead answer as a condition to it "consider[ing]" stipulating to a stay. Ex. J. Repairify is unwilling to waive these rights, particularly considering the weakness of Elitek's claims. *Infra* at § IV.D.

Staying this case would be an appropriate "exercise of [the] court's inherent power to manage its own docket." *Murata Mach. USA* , 830 F.3d at 1361. All three pertinent factors weigh in favor of a stay: "(1) whether a stay will simplify the issues in question and streamline the trial; (2) whether a stay will reduce the burden of litigation on the parties and on the court; and (3) whether a stay will unduly prejudice or tactically disadvantage the non-moving party." *In re Groupon Derivative Litig*., 882 F. Supp. 2d at 1045. As noted above, Elitek's allegations underlying its antitrust claims and related unfair competition claims are virtually identical to the allegations made by Elitek in its defenses and counterclaims raised in the WDTX infringement action. That case is approaching the close of fact discovery (in August 2023), the court conducted a Markman hearing more than one year ago, and is set for trial to begin in ten months, on May 6, 2024. *Supra* at § II.A. Waiting for the WDTX court to resolve claim construction, infringement, invalidity, and unenforceabilty issues raised in that case would greatly simplify, if not entirely resolve, the issues in this case, substantially reducing the burden of the litigation on the parties and the Court. Elitek would not be unfairly prejudiced because it had a full opportunity to raise these claims as counterclaims in the WDTX Case, and still has the opportunity to litigate the overlapping and related issues in that court. Staying this case would avoid a waste of judicial resources and an unnecessary burden on Repairify. Accordingly, if the Court does not dismiss this case, it should stay the case pending resolution of the WDTX Case.

### D. Counts I and II Fail to Adequately Plead Antitrust Liability

Elitek's antitrust counts are based on monopoly power or a dangerous probability of achieving monopoly power. To make those determinations, it is first "necessary to consider the

9

relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc.*, 506 U.S. at 456. Without a plausible and relevant market, an antitrust claim fails because "[i]t is impossible to monopolize a market that does not exist." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 480 (7th Cir. 1988).

"For a monopoly claim to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, *and it must be plausible.*" *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (quotation marks and citations omitted) (emphasis added). The relevant market includes both product and geographic components. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) ("Economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market.").

Although courts are "generally hesitant" to dismiss antitrust claims for failure to allege a relevant market because market definition is often a "deeply fact-intensive inquiry," "this hesitancy does not mean that a court should blindly accept a market definition proposed in a complaint." Indeed, courts should dismiss a claim when "the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fails even to attempt a plausible explanation as to why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd.*, 2013 WL 4599903, at *3 (quotation marks and citations omitted).

### 1. Elitek Fails to Plausibly Allege a Relevant Market

Elitek's proposed nationwide market of "Remote Vehicle Diagnostics," which Elitek defines as "providing vehicle diagnostic services to repair/collisions shops in the United States from a remote location" is not plausible. Dkt. 1 at ¶ 9. Elitek chose this narrow market to support

10

its allegation that Repairify has monopoly power "as demonstrated by its high market share of the Remote Vehicle Diagnostics Market" and "relative size to the other competitors." *Id.* at ¶ 107. Without such a narrow market definition, Elitek could not have alleged that Repairify has monopoly power. But Elitek's own allegations establish that there is no relevant nationwide "Remote Vehicle Diagnostics" market because there are interchangeable substitutes and Elitek's explanations for excluding them are factually unsupported and facially implausible.

Elitek alleges that car repair shops require access to scan tools to "perform vehicle diagnostics, such as scanning or programming a vehicle's sub-systems" in order to fix their customers' cars. *Id.* at ¶ 5. Further, Elitek alleges that shops can access such scan tools in four different ways: (1) by obtaining a scan tool directly from a vehicle manufacturer (an "OEM scan tool"); (2) by obtaining an "after market scan tool"; (3) by hiring a third-party with access to scan tools to perform in person vehicle diagnostics ("mobile vehicle diagnostic services"); and (4) by hiring a third-party with access to scan tools to perform remote vehicle diagnostics. *Id.* at ¶¶ 5-7. Despite its own allegations setting forth at least three reasonable substitutes for remote vehicle diagnostics, Elitek strives to exclude each of them in an attempt to define a narrow product market. *Id.* at ¶¶ 5, 11-12. But Elitek's attempt at exclusion fails because its reasoning is impermissibly conclusory and/or facially implausible in view of its own allegations.

### i. Elitek's Exclusion of Mobile Vehicle Diagnostics is Implausible

Elitek's complaint alleges that mobile vehicle diagnostics (e.g. third party technicians traveling to repair shops with scan tools) are not a reasonable substitute because (1) the purported limited geographic availability of mobile services and (2) obtaining mobile vehicle diagnostics is delayed as compared to remote vehicle diagnostics. *Id.* at ¶ 11. Neither is plausible. Regarding geographic availability, Elitek alleges that *its own offering* of mobile vehicle diagnostics have a limited range of "80 miles from a city center" and Elitek "*only* has

11

approximately 85 locations in the United States." *Id.* (emphasis added). But Elitek does not allege that it is the *only* such provider, instead, the Complaint is silent on the dozens, if not hundreds, of competitors that provide mobile vehicle diagnostics throughout the United States. A substitute product is not unreasonable simply because the plaintiff does not offer it.

Further, even if Elitek had plausibly alleged geographic limitations of mobile services, these allegations are self-defeating as they demonstrate that Elitek has improperly pled a nationwide geographic market, because Elitek is relying on an amalgamation of locations more than 80 miles from city centers to exclude a reasonable substitute. *Id.* at ¶ 11. Put another way, Elitek is trying to rely on a geographically limited customer base to exclude a substitute that is widely available, while simultaneously alleging that the remote vehicle diagnostics market is nationwide. Elitek makes no effort to allege that a significant portion of customers could *not* turn to mobile vehicle diagnostics, and indeed it would be implausible to suggest as much given the allegations' tie to "city centers." Elitek's improperly pled geographic market is grounds alone for dismissal. *Republic Tobacco Co.*, 381 F.3d at 737 (7th Cir. 2004).

Elitek's argument that mobile vehicle diagnostics are not reasonable substitutes because they are not available as quickly as remote diagnostics (*id.* at ¶ 11) is also facially implausible for two reasons. First, Elitek has not alleged that customers in the relevant market *require* or insist upon instantly available vehicle diagnostics, such that it is implausible for Elitek to suggest that the additional time required to obtain mobile services make it an unreasonable substitute. Second, Elitek's own allegations are that it successfully offers mobile services from *85 locations*. (*id*. at ¶ 11), it is implausible for Elitek to allege that customers needing vehicle diagnostics are not willing to use mobile services when Elitek also alleges that it is actively and successfully offering that service.

12

### ii. Elitek's Exclusion of OEM Scan Tools is Implausible

Elitek also categorically excludes the purchase of OEM scan tools as being "relatively expensive." *Id*. at ¶¶ 5, 12. But Elitek does so without stating any pricing or the comparison made. Further, Elitek's conclusion that the purchase of OEM scan tools is not a reasonable substitute for obtaining vehicle diagnostics is facially implausible as it ignores Elitek's own allegations that there *is* a market for OEM scan tools. *Id.* at ¶ 5. It is not plausible for Elitek to allege that vehicle manufacturers offer OEM scan tools to car repair shops, but that the shops do not purchase them. And some remote providers use OEM scan tools in providing their services, such as Repairify and AirPro (which utilizes OEM tools directly connected to the vehicle). Ex. K (*passim*) (*See* AirPro Or.).³ To the extent that Elitek were to argue in opposition that OEM scan tools are not a reasonable substitute for smaller car repair shops that do not specialize in particular vehicle makes, this would only further demonstrate that Elitek has not pled a relevant market as Elitek's market definition has no such limitation.

### iii. Elitek's Exclusion of Aftermarket Scan Tools is Implausible

While not entirely clear from the Complaint, Elitek appears to allege that the purchase of aftermarket scan tools are not a reasonable substitute for remote vehicle scanning. But Elitek has not pled sufficient facts for this exclusion to be plausible. Elitek devotes just four words of its fifty-seven-page Complaint to support the exclusion of aftermarket scan tools, alleging that they "*typically* have limited capabilities." *Id.* at ¶ 5 (emphasis added). Elitek makes no attempt to allege what the purported limitations are or that car repair shops refuse to use aftermarket scan tools for vehicle diagnostics. Indeed, Elitek's carefully qualified allegation that aftermarket scan tools "typically" have limitations implicitly acknowledges that at least some aftermarket scan

---

³ The Court may take judicial notice of this court order. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

tools are reasonable substitutes, which is also plausible considering Elitek's own allegations that there is a market for such tools which are obviously used by many customers in various situations. Further, Elitek does not allege that providers of remote vehicle diagnostics do not themselves use aftermarket scan tools in the course of providing remote diagnostics, which only further undermines Elitek's attempt to exclude them as a reasonable substitute.

####        iv.        Elitek's Conclusory Cross-Elasticity Allegations Fail

In addition to analysis of interchangeable substitutes, determination of the relevant market is also informed by analyzing whether there is cross-elasticity between the product in the proposed market and the possible substitutes. *Int'l Equip. Trading, Ltd.*, 2013 WL 4599903, at *3. "If two products share a high cross-elasticity of demand—in that an increase in the price of one product causes consumers to switch to the other, and vice versa—then those products likely are interchangeable and may properly be considered part of the same product market." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017).

Elitek asserts that there is no cross-elasticity of demand between remote and non-remote diagnostics (i.e., mobile and directly connected scan tools), but only does so in a single sentence. Dkt. 1 at ¶ 13 ("On information and belief, except perhaps in extremely non-economically significant unrealistic hypotheticals, if the price for remote diagnostic services increases, it does not cause a rise in the demand for non-remote diagnostics services."). Elitek's conclusory allegation can be ignored because it is merely a legal conclusion passed off as fact, admitting it is incomplete (e.g., "except perhaps in extremely non-economically significant unrealistic hypotheticals"). *See, e.g.*, *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (dismissing antitrust complaint, stating "conclusory allegations [of cross-elasticity of demand] offers no support for [plaintiff's] claims; they merely restate a commonly used test for market definition without providing any factual basis for the claim").

14

### v. Elitek's Own Allegations Demonstrate that the Proposed Market is Facially Implausible

Taking a step back, Elitek's proposed market, which excludes numerous reasonable substitutes, is facially implausible in view of Elitek's own allegations. The Complaint acknowledges that vehicle diagnostics are necessary for "[m]odern vehicles." Dkt. 1 at ¶ 5. The Complaint also alleges that that Repairify did not purchase the assets that formed its remote vehicle diagnostics services, and the asserted patents, until 2015. *Id.* at ¶¶ 44-45. Further, the Complaint acknowledges that the inventors of Repairify's asserted patents did not file the first underlying application until December 2010. *Id*. at ¶ 21. But both parties' experts testified in the WDTX Case that vehicles have been required to have On-Board Diagnostics ("OBD II") ports to access vehicles' computer systems since 1996. Ex. G at ¶ 11 (WDTX Dkt. 39), Ex. I at ¶ 17 (WDTX Dkt. 41-1). These ports were, and are, the point of access for all vehicle diagnostics. Elitek's proposed relevant product market, which excludes OEM and aftermarket scan tools, and mobile vehicle diagnostics, leads to the implausible conclusion that vehicles located 80 miles from 85 unnamed city centers, between the years 1996 and at least 2010, received no vehicle diagnostics, and that when remote diagnostic services were launched, they did not compete with directly connected scan tools or mobile services.[4] This facial implausibility demonstrates that Elitek has not pled a proper relevant market and is grounds for dismissal.

### V. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed or stayed pending the outcome of *Repairify, Inc. v. Keystone Automotive Indus., Inc*., Case 6:21-cv-00819-ADA (W.D. Tex.).

---

[4] Elitek has not alleged that any party offered remote vehicle diagnostics prior to Repairify and AES Technologies, LLC, (the predecessor in interest to Repairify's remote vehicle diagnostics business and the asserted parents).

15

Dated: July 11, 2023 By: */s/ Benjamin T. Horton*
Benjamin T. Horton
Marshall, Gerstein & Borun LLP
6300 Willis Tower
233 S. Wacker Drive
Chicago, IL 60606
T: 312.474.6300
E: bhorton@marshallip.com

*Counsel for Defendant*
*Repairify, Inc.*

16